**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,**

v.

**WOOSTER BRUSH COMPANY EMPLOYEES RELIEF ASSOCIATION (81–3638), The Wooster Brush Company, (81–3644), Defendants-Appellants.**

Nos. 81–3638, 81–3644.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 1, 1983.

Decided Feb. 8, 1984.

Evan Jay Cutting (argued), James D. Tomola, Baker & Hostetler, Washington, D.C., William J. Rosenthal (argued), Shewe & Rosenthal, Baltimore, Md., for defendants-appellants Wooster Brush Co. Employees Relief Ass'n.

Ronald E. Holtman, Daniel Plumly (argued), Wooster, Ohio, William J. Rosenthal (argued), Shewe & Rosenthal, Baltimore, Md., for defendant-appellant Wooster Brush Co.

Bruce B. Elfvin, EEOC, Cleveland, Ohio, Jeffrey Bannon (argued), Warren Bo Duplinsky, Raymond R. Baca, EEOC, Appellate Division, Washington, D.C., for E.E.O.C.

Before ENGEL and MARTIN, Circuit Judges, and BROWN, Senior Circuit Judge.

ENGEL, Circuit Judge.

In this appeal we must decide whether Title VII of the Civil Rights Act, as amended by the Pregnancy Discrimination Act of 1978, codified at 42 U.S.C. § 2000e(k) (Supp. II 1978), requires the inclusion of pregnancy benefits as part of the disability benefits provided by an independent and longstanding Employees Association. If it does, we must decide whether the failure to include those benefits gives rise to an action by the Equal Employment Opportunity Commission against the Association or against the Employer, which makes substantial contributions to the Association, or both. After a nonjury trial the district judge entered a judgment against both the Association and the Employer.

We hold that the Association itself was not an employer within the meaning of the Act. Since it is an independent legal entity, specifically found not to be a sham, it is not subject to liability under the Act, at least absent any showing that its inclusion for purposes of relief is essential in order not to frustrate the purposes of the Act. At the same time, we hold that the Employer, by making substantial contributions to a disability benefits plan which, if directly operated would violate the pregnancy amendments, has effectively discriminated against women on account of their sex in the "terms, privileges, and conditions" of their employment. The Employer is, therefore, subject to appropriate remedial relief. Thus we affirm in part and reverse in part the judgment of the district court and remand for the purpose of dismissing the action as to the Association but with instructions to modify certain aspects of the relief granted against the Employer.

## I.

We are assisted in this appeal by a thorough and carefully reasoned opinion of the district court, reported in *EEOC v. Wooster Brush Co.,* 523 F.Supp. 1256 (N.D.Ohio 1981). The trial judge, in his discussion and

conclusions of law, carefully considered nearly all of the judicial authority in this circuit and elsewhere which was available to him at the time.

In addition, the extensive facts found after a full trial on the merits are carefully and accurately chronicled in the district court opinion at 523 F.Supp. 1258–59. For convenience we repeat them here as they were found in the district court:

## FACTS

The Company is a manufacturer of paint brushes, rollers, sprayers, and other associated items. It is a corporation operated by a board of directors and officers. The Company employs both male and female employees, who, as employees, are entitled to certain company benefits as explained to them upon joining the Company and as listed in the employee handbook. One of the benefits listed in the employee handbook is the opportunity for membership in the Association.

Defendant Association is an unincorporated association formed for the purpose of providing disability benefits to its members who are unable to work because of illness. It is operated by its board of directors and officers. The Association members elect the board of directors to carry on the day-to-day functions of the Association, although as a practical matter, one of the Company employees who is also an Association member processes routine claims pending final approval by the board.

The Association was formed in 1935 at the initiative of Company employees. Before that time, it had been customary to "pass the hat" to collect money for a fellow employee whenever an employee became ill and was therefore unable to work. Upon proposing the Association, the employees elected a founding board of directors that in turn investigated and drafted a constitution. The Association constitution was adopted by Association membership and to date, with amendments, the constitution remains in effect.

Under the constitution, the Association is run by a five-member board of directors, each member having an equal vote. Four of the directors are elected from and by Association membership, and the fifth director is the Company secretary/treasurer or his designee.

From 1949 through 1959 Woodrow G. Zook had been elected to the board. In 1959 the Association membership amended the constitution to provide for the Company's secretary/treasurer or his designee to sit on the board. Zook, the secretary/treasurer in 1959, has retained his appointed seat on the Association board although his positions with the Company now include treasurer, president, chief executive officer, and member of the Company board of directors.

Association membership is voluntary. To become an Association member, one must 1) be an employee of the Company, 2) submit a recent physical examination report, 3) be approved for membership by a majority of the Association board of directors, and 4) pay monthly dues into the Association fund.

Association membership is available only to employees at the Wooster, Ohio; Elyria, Ohio; and Reno, Nevada plants. Employees of the Acme Brush Corporation, the Company's wholly-owned subsidiary, are ineligible to join the Association.

At the end of approximately two (2) months of employment, new employees are informed in a meeting with the person in charge of the Company's hourly personnel that they will become eligible for Company insurance benefits at the end of three (3) months. Employees are also informed at the same meeting that they may apply for membership in the Association.

The requirement that the prospective Association member must submit a physical examination report may be satisfied by submitting the report of the Company's pre-employment physical. If the employee chooses not to submit the report of the Company's physical, the applicant must obtain a physical at his or her own expense.

Once the physical examination report has been submitted, it and the employee's application are presented to the Association's secretary/treasurer for the board of directors' consideration at the next board meeting. Applicants must meet minimum health requirements, and approval of one's health for purposes of working for the Company will not trigger automatic acceptance into the Association.

Finally, to maintain membership in the Association, the member must pay monthly dues, presently set at the amount of Two Dollars, Fifty Cents ($2.50). The dues of hourly and non-exempt salaried workers are deducted from their Company payroll checks.[1] Exempt salaried workers pay their dues in annual payments.

---

[1] Non-exempt salaried workers are not exempt from coverage by wage/hour provisions as contained in sections 6 and 7 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 206 & 207, and are therefore paid in overtime or compensatory time for hours worked beyond a forty-hour work week. Exempt salaried workers are not subject to the wage/hour laws and are paid a straight salary.

In addition to receiving dues from its members, the Association receives funds from the Company. The Company regularly contributes to a variety of charitable organizations. Charities listed on the Company's income tax returns include the Association, the United Way, the YMCA, the College of Wooster, and Goodwill Industries. About thirty-nine percent (39%) of the Company's total charitable contribution budget is donated to the Association. In addition to monetary contributions for which the Company takes charitable deductions, the Company makes monetary contributions for which it takes no charitable deductions. Other contributions are made, in kind, to what the Company believes are worthy organizations such as parent/teacher organizations, Boy Scouts, and churches that request company products for use in their respective cleaning and refurbishing projects.

When the Association was first formed, the Company contributed twenty-five percent (25%) of the Association's operating budget. Currently, the Company contributes dollar-for-dollar the amount of dues paid by Association members. When the Association fund reaches Fifty Thousand Dollars ($50,000.00), a moratorium is placed on dues payments and, consequently, no funds are received from the Company. No additional dues are collected until payment of disability benefits utilizes money in the fund, thereby reducing the fund and again necessitating the payment of more dues.

The Association pays One Hundred Dollars ($100.00) a week for up to thirty-nine (39) weeks in any one year or for any one disability to male and female members who are disabled due to injury or illness. The Association does not, however, pay benefits on claims related to disability arising from pregnancy.

The EEOC brings this action upon a determination that there was reasonable cause to believe that charges of unlawful employment practices by the Company and the Association in violation of Title VII were true and that conciliation attempts by the EEOC had failed. The basis of the complaint is an allegation that the Company, directly and by and/or through its agent, the Association, unlawfully discriminates against women because of their sex by providing disability benefits for temporary disabilities other than pregnancy but by failing to provide pregnancy-related disability benefits.

## II. Liability for the Title VII Violations

The Equal Employment Opportunity Commission in its complaint charged that the Wooster Brush Company Employees Relief Association and the Wooster Brush Company violated Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978. 42 U.S.C. §§ 2000e—2000h-5 (1976 and 1978 Supp. II). 42 U.S.C. § 2000e-2(a)(1) provides that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with re-

spect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." Under 42 U.S.C. § 2000e(k)

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, child-birth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

The EEOC asserted before the district court that a disability plan funded in equal part by the Company and its employees and administered by the Association, violated this portion of the Civil Rights Act by excluding pregnancy benefits from its coverage. The district court agreed and granted injunctive relief and benefit payments to twenty-five female employees.

No party has disputed the status of the Wooster Brush Company as an employer within the meaning of Title VII. Instead the dispute, both in the district court and here has centered upon the status of the defendant Wooster Brush Company Employees Relief Association and upon the nature of its relationship to the Company.

As pointed out in the district court's opinion, the EEOC claims that the Company and the Association were liable as a single employer under the definition of subsection (b) of 42 U.S.C. § 2000e or in the alternative that both entities fell within subsection 2000e(b) by virtue of an agency relationship between the Company as principal and the Association as agent. For its part the Company maintains that it did not discriminate against women in the employment practices for which it was admittedly responsible and that it possesses no power or authority to compel the Association to modify its disability plan so as to include pregnancy benefits. It points to the fact that women and men working at the Wooster Brush Company receive the same pay for doing the same work, that they are entitled to the same unpaid leave of absence for disability, which does include pregnancy related disabilities, and that men and women are equally eligible for group hospital, surgical and life insurance benefits including supplemental Medicare insurance. The EEOC did not argue that the Association was originally formed for the benefit of the Company or at the Company's direction; it is clear that the Association was created by the employees themselves acting independently of the Company. Likewise since the Association itself has no employees whatsoever, it cannot fall within the definition of an employer under 42 U.S.C. § 2000e(b), at least when independently considered.

## A. The Liability of the Association

The trial judge pointed out that in determining whether two entities may be liable as a single employer under Title VII two basic approaches have been taken. The first, characterized by *Baker v. Stuart Broadcasting Company,* 560 F.2d 389 (8th Cir.1977), rests upon a finding that the two entities constitute a single or joint employer.[1] The second rests on a finding that one entity, here the Association, is merely the agent or instrumentality of the other, an approach employed in *EEOC v. ISC Financial Corp.,* 14 Empl.Prac.Dec. ¶ 7729 (W.D. Mo.1977). *See also Linskey v. Heidelberg Eastern, Inc.,* 470 F.Supp. 1181, 1184 (E.D. N.Y.1979); *EEOC v. Upjohn Corp.,* 445 F.Supp. 635, 639 (N.D.Ga.1977).

In examining those cases the court concluded that although an agency relationship did not exist, the Company and the Association could be considered a joint employer

---

1. *Baker* actually addresses a somewhat different issue than the one which confronts us. In *Baker* the problem was whether the number of employees of two separate corporations could be totaled to meet the jurisdictional number requirement of Title VII. 42 U.S.C. 2000e(a). For the purpose of this opinion we assume that the *Baker* test applies equally well to the question of whether an entity not otherwise an employer is subject to Title VII because it associates with an entity that is an employer.

under *Baker v. Stuart Broadcasting Company*. The Court in *Baker* noted that there are four criteria for determining whether a consolidation of separate entities is proper for application of the standards promulgated by the National Labor Relations Board: (1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control. 560 F.2d at 392. The court concluded that the liberal treatment accorded the interpretation of Title VII warranted the use of like factors in determining whether two entities should be considered to be one employer under 42 U.S.C. § 2000e(b). *Id.* The trial court in the present case found that the *Baker* standard was useful by analogy in helping to analyze the relationship of the Company and the benefits Association.

In applying the first standard, that is the interrelatedness of Company and Association operations, the trial court found a clear interrelationship in the operations of the two. With this conclusion we fully agree. Recently hired employees received information about the opportunity for Association membership, which is conditioned only upon employment with the Company, physical examination requirements and an agreement to join and pay the prescribed dues. The Association has no paid employees of its own but depends upon Association volunteers who are permitted to do their work on Company time and with the use of Company equipment and space. The trial court also pointed to the fact that the election of board members to the Association was handled through the Company's facilities.

The district judge next considered the second *Baker* criterion and concluded that the Association and the Company shared common management. Although the Company and the Association are run by separate boards, the trial judge noted that one man, Woodrow G. Zook, serves as the Company treasurer, president and chief executive officer and was on the board of directors of the Association. Zook exercised a unique position of power in both the Company and the Association. While this is true, the history of the Association indicates that Zook was an ordinary employee when the Association was first formed and that his continuation as a member of the Association and his rise to the presidency of the Company were fortuitous insofar as the Association was concerned. While the dependency of the Association upon the Company is unquestioned, it nonetheless appears that the Association enjoys a separate legal identity and that Zook was only one member of the managing board of the Association. We are unable therefore to find that the common management test is met, especially in view of the court's own finding, that the Association is in no way a sham.

The judge found that the third test, centralized control of labor relations, was also met. This he found because of the Association's dependence upon the Company for the provision of facilities and because the Association itself does not have individual employees. As true as this might be, the Association does not appear in any way to make an effort to control labor relationships. The control of labor relations is vested solely in the Company. The Company is not unionized and the Association does not pretend to be a union in any form. The limited purpose of the Association in no way involves it in labor relations. We seriously doubt whether this criterion, was intended to apply to the unique circumstances of this case.

The final test under *Baker* is whether the two entities shared common ownership or financial control. In evaluating the present case in light of this test the court noted that the Company contributed fifty percent of the Association's financial budget. The court also emphasized that the Company stood to gain by holding out Association benefits as one of the benefits of working for the Company.

However, the fourth *Baker* test has been interpreted in this circuit as an inquiry into the legitimacy of the entities. If neither of the entities is a sham then the fourth test is not met. *See York v. Tennessee Crushed Stone Association,* 684 F.2d 360 (6th Cir.

1982); *Hassell v. Harmon Foods, Inc.*, 454 F.2d 199 (6th Cir.1972), *aff'g, Hassell v. Harmon Foods, Inc.*, 336 F.Supp. 432 (W.D. Tenn.1971). It appears indisputable that the Association retains its distinct legal identity and has its own separate managerial board. The district court expressly found the Association not to be a sham.[2] Under these circumstances we are unable to agree with the conclusion that the Company and the Association meet the fourth test of *Baker v. Stuart Broadcasting.* Because only one of the *Baker* criteria is met we hold that the Company and the Association cannot be considered to be a single or joint employer under Title VII.

Much careful thought and research has gone into the district court's analysis of the question whether the Association is a bona fide private membership club and thus exempt under 42 U.S.C. § 2000e(b) or whether it is engaged in the business of insurance and thus protected from liability by the McCarran-Ferguson Act. 15 U.S.C. §§ 1011–1015 (1976). Without expressing any disagreement with the rationale of the district court's findings in this regard, we conclude that it is not necessary to address these difficult issues in view of our holding that the Association should not be considered to be an employer.

### B. The Liability of the Company

The Wooster Brush Company is unquestionably an "employer" within the meaning of Title VII. Under the relevant portions of the Act, 42 U.S.C. § 2000e-2(a)(1), "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." For purposes of Title VII,

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnan-

cy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k).

As we have mentioned earlier, if the Association's disability plan had been adopted directly by the Company it would have been violative of the pregnancy discrimination provisions of Title VII above cited. We can see nothing in Title VII, however, to prevent the employees of Wooster Brush Company, acting completely on their own, from joining together to provide additional benefits payable out of their own separate contributions and for those benefits to cover any particular risk the employees might, collectively, desire. Likewise we see nothing improper in their accepting contributions from their employer or from anyone else, made without strings attached. However, the consequences of the employer's participation in such a plan are quite a different matter, for the employer's statutory duty is plain: the employer must not discriminate on account of sex in dispensing disability benefits.

█ As the facts of the case show, the Wooster Brush Company clearly participated in the Association's activities. The Company takes advantage of the benefits conferred upon its employees by membership in the Association even though its own participation and the individual membership are voluntary. The Company holds out membership in the Association as one of the privileges of employment. The Wooster Brush Company contributes substantial matching funds to the program. In addition, it is undisputed from the record of the

---

**2.** Several facts bolster the district court's finding that the Association is not a sham. The Company and the Association are separate entities for tax purposes. The Company is a taxable entity; the Association is a tax-exempt organization under 26 U.S.C. § 501(c)(9) (1976). Furthermore, the Association is an unincorporated association governed by Ohio law. *See, e.g.,* Ohio Rev.Code Ann. § 1745.01–.04 (Baldwin 1982). The Company on the other hand is a for profit corporation under Ohio law.

Company's participation, through its delegate to the board, that it was aware and approved of the decision of the Association not to include pregnancy disability benefits among the benefits paid by the Association. We do not believe, therefore, that the Company can be heard to say that it has completely disassociated itself from the objectives and activities of the Association.

We agree with the rationale of the district court that to disregard the plain effect of such conduct would in effect require the court to give its imprimatur "to a system whereby any company could set up a disability fund for its employees and thereby avoid the reach of Title VII." *EEOC v. Wooster Brush Company,* 523 F.Supp. 1256, 1266 (N.D.Ohio 1981). Further we agree with the comment in *Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), also cited by the district judge that, "Title VII ... primarily govern[s] relations between employees and their employer, not between employees and third parties. We do not suggest, of course, that an employer can avoid his responsibilities by delegating discriminating programs to corporte shells." *Id.* at 718 n. 33, 98 S.Ct. at 1380 n. 33.

Of like import is *Arizona Governing Committee v. Norris,* —— U.S. ——, 103 S.Ct. 3492, 77 L.Ed. 1236 (1983), which presented the obverse of the situation before the court in *Los Angeles Dept. of Water and Power v. Manhart.* In *Manhart,* the Court held that Title VII prohibited an employer from requiring women to make larger contributions in order to obtain the same monthly benefits as men. In *Norris* the same contributions were made by both men and women but the independent insurers were then free on an actuarial basis to calculate differing and hence smaller deferred payments to women based upon their anticipated longer life span following retirement. The Court held that this was impermissable under Title VII. In holding that the compensation plan in *Norris* was equally discriminatory as that found unlawful in *Manhart,* a majority of the Supreme Court speaking through Justice Marshall held:

Under these circumstances there can be no serious question that petitioners are legally responsible for the discriminatory terms on which annuities are offered by the companies chosen to participate in the plan. Having created a plan whereby employees can obtain the advantages of using deferred compensation to purchase an annuity only if they invest in one of the companies specifically selected by the State, the State cannot disclaim responsibility for the discriminatory features of the insurers' options. Since employers are ultimately responsible for the "compensation, terms, conditions, [and] privileges of employment" provided to employees, an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination. In this case the State of Arizona was itself a party to contracts concerning the annuities to be offered by the insurance companies, and it is well established that both parties to a discriminatory contract are liable for any discriminatory provisions the contract contains, regardless of which party initially suggested inclusion of the discriminatory provisions. It would be inconsistent with the broad remedial purposes of Title VII to hold that an employer who adopts a discriminatory fringe benefit plan can avoid liability on the ground that he could not find a third party willing to treat his employees on a nondiscriminatory basis. An employer who confronts such a situation must either supply the fringe benefit himself, without the assistance of any third party, or not provide it at all.

—— U.S. at —— – ——, 103 S.Ct. at 3501–02, 77 L.Ed. at 1253 (footnotes omitted). We conclude therefore that the Company may properly be held responsible for discriminating against women in the provision of disability benefits.

### III. The Remedy

### A. The Liability of the Association

██  Several objections are made by appellants with respect to the remedy.

First, the Association maintains that the relief granted should not be extended to include it. We agree. We have already held that the Association's liability is precluded because it is not an employer under the Act. We are, however, reluctant to hold that the Association would be immune from the reach of Title VII even were its presence as a party in this litigation necessary in order to achieve a complete remedy. Because of the broad reach of Title VII it is perhaps conceivable that a justification could be found for extending liability to the Association upon a showing that its inclusion was necessary to avoid frustrating the purposes of the Act. Here, however, full relief can be affected by imposing the burden of compliance solely upon the Company. We believe that it is sufficient to observe as did Justice Marshall in *Arizona Governing Committee v. Norris,* that "an employer who confronts such a situation must either supply the fringe benefit himself, without the assistance of any third party, or not provide it at all." —— U.S. at ——, 103 S.Ct. at 3502, 77 L.Ed. at 1253 (1983). We therefore conclude that the primary responsibility for the remedy is properly cast upon the Employer. It is the Employer and not the Association which is subject to the proscriptions of the Act. Thus it is unnecessary to involve the district court in the intricate problem of allocating responsibility between the Company and the Association for the back payments or any accruing benefits.

The Wooster Brush Company voluntarily participates in the Association through contributions to the disability plan. This is a highly salutary relationship which benefits the employees of the Company, by providing disability benefits, and the Company itself, by attracting and maintaining good employees. Certainly neither the EEOC nor the court has any interest in discouraging the continuation of this relationship. It is desirable that the relationship continue with as little interference as is reasonably consistent with the Company's obligation to comply with the Act. Our only concern is that the Company not avoid its obligation not to discriminate on account of sex.

Certainly there will exist a strong incentive on the part of both the Company and the employees to revise the Association's benefit plan to include pregnancy benefits following this opinion. The history of the Association's disability benefits plan shows it to have been an attractive one to the employees generally; they have been willing to share in the burden of financing it, even though it has always been a voluntary program and any employee was free to disassociate himself from it. The great advantage to imposing liability upon the Company alone is that it accords with the proper legal status of the parties and places the burden where it belongs for effective enforcement. It also leaves the parties the maximum flexibility to work out and to continue the operation of a voluntary plan without interference by the EEOC or the court. In this way the individuals who are intended to be benefited by the Act will have been protected and the remaining employees will not be retaliated against by the undue withdrawal of assistance by the Company. The Company and the Association are left free to continue their purely voluntary relationship subject to the restriction imposed by Title VII that the employer may participate in the program only so long as it makes good on its own any failure of the plan to provide pregnancy disability benefits.

### B. The Retroactive Award of Benefits

The appellants next maintain that the district court's award of back benefits was inappropriate. In this connection it is first noted that the parties stipulated that if either or both defendants were found liable in the action, 25 women, listed in the stipulation during the trial, would be entitled to receive monetary compensation. The compensation was fixed at $100.00 per week, excluding the first week of disability for up to 39 weeks of actual disability as certified by a physician. The district court therefore ordered such compensation upon finding that the Company and the Association had violated the Act.

■ Since the amount of retroactive relief has been resolved by stipulation we need not determine whether the amount was compelled as a matter of law. It is sufficient to say that given the stipulation, the provision for retroactive benefits to cover the 25 women specified does not appear to be unduly burdensome, nor so onerous as to amount to an abuse of discretion. It is true that in *Los Angeles Dept. of Water v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1977), the Supreme Court determined that it would not require retroactive payment of benefits with respect to a pension plan which had discriminated against women where the lower court had found that to require retroactive benefits would jeopardize the insurer's solvency and ultimately the insureds' benefits. Although that problem may have arisen had we upheld the trial judge's extension of liability to the Association, it does not apply here where liability is limited to the employer. This is especially true because the employer had full knowledge of the amendment of the Act regarding pregnancy benefits and its representative on the board of the Association engaged in significant and extended discussions concerning whether the Association's plan ought to include such disability benefits.

## C. The Injunctions

After finding both of the defendants liable for violating Title VII, the district court ordered that "defendants are hereby permanently enjoined from discriminating against women on the basis of their gender. Further, defendants are hereby enjoined from reducing the amount of the weekly disability benefits and/or the period for which disability benefits may be awarded."

### 1. The Injunction Against Discrimination

Appellants claim that the first sentence of the injunction granted by the court was overbroad in that it amounted essentially to a permanent "obey the law" injunction. There is no suggestion in this litigation that Wooster Brush has engaged in any sexually

discriminatory conduct other than not providing disability benefits for pregnancy. On the contrary the district court expressly made determinations that in all other particulars known to it, the Company was in full compliance with Title VII.

■ Rule 65(d) of the Federal Rules of Civil Procedure provides that "every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail . . . the act or acts sought to be restrained." As pointed out by Judge Roney in *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 897–98 (5th Cir.), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978):

> This command of specificity is a reflection of the seriousness of the consequences which may flow from the violation of an injunctive order. *See Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 438–39, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976). The word "discriminating," like the word "monopolizing" in *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 125–26, 68 S.Ct. 947, 92 L.Ed. 1245 (1948), is too general. The provision is more specific than Title VII itself only in that it does not prohibit employment discrimination based on religion and natural origin. *See* 42 U.S.C.A. § 2000e–2. Such "obey the law" injunctions cannot be sustained. *See, e.g., NLRB v. Express Publishing Co.,* 312 U.S. 426, 435–36, 61 S.Ct. 693, 85 L.Ed. 930 (1941); *Russell C. House Transfer & Storage Co. v. United States,* 189 F.2d 349, 351 (5th Cir.1951).

Therefore the first sentence of the district court's injunction should be limited to enjoining the Wooster Brush Company from discriminating against employees on account of their sex by participating in any fringe benefit programs, that would violate the provisions of 42 U.S.C. § 2000e(k) if performed by the employer. We think that this is sufficient and more consistent with the specific commands of Rule 65.

## 2. The Injunction Preventing Alteration of Benefits.

The defendants complain that the second sentence of the injunction was overbroad because the trial judge permanently enjoined both the Company and the Association from altering benefits. Both the EEOC and the defendant agree that such an injunction ought not to continue into perpetuity; the question is how long should it continue.

The pregnancy amendments provide specifically that: "Until the expiration of a period of one year from the date of enactment of this Act ... no person ... [shall] reduce the benefits or compensation." Pub.L. No. 95–555 § 3, 92 Stat. 2076 (1978). The EEOC and the defendants do battle with the legislative history of the foregoing provision. The defendants insist that the one year requirement expired a year after the date of enactment. The EEOC urges instead that since the cited provision was designed to allow time for good faith compliance, the one year period ought not apply limits at all to those companies like Wooster who have shown themselves unwilling to comply promptly.

The EEOC cites remarks made by Senator Williams indicating that the one year proviso was intended to "provide all affected parties with an opportunity to gain experience with the actual impact of the legislation." 123 Cong.Rec. 29,385 (Sept. 15, 1977). The EEOC then concedes that after a year, according to Senator Williams, an employer might change his plans by reducing benefits or even eliminating the plans. However, the EEOC argues that "this statement contemplates that the employer has come into compliance with the Act by the specified time—here April 29, 1979—and has maintained compliance without reducing benefits until October 31, 1979." Thus, the EEOC maintains that the employer who has not come into compliance with the Act by April 1979 is not, after October 1979, automatically allowed to reduce his benefits in order to comply with the Act. The EEOC also refers to Senate Report 95–331:

It should be noted, in this light that the time limits in section 3 *cover good faith employers who come into compliance* with the bill once it becomes law; these time limits must not be construed as permission for employers who do not comply immediately to reduce benefits once the time limits have run.

S.Rep. No. 95–331, 95th Cong. 1st Sess. at 8 (1978) (emphasis added). The EEOC, therefore, suggests that Wooster may only reduce benefits by applying to the district court and showing that the order has become "excessively burdensome." Upon this showing, the court may in its discretion grant relief pursuant to Rule 60(b)(6).

We conclude that the arguments made on the basis of legislative history are largely ineffective, at least to change the mandatory nature of the one year period.

Legislative history is often most helpful in resolving ambiguities in statutory language. At the same time it may not be used to justify a departure from the plain meaning of clear and unambiguous language. The Congress expressly provided that there should be no reduction of benefits until one year from the date of enactment of the Act. Therefore it would seem that the maintenance of benefits requirement was terminated on October 31, 1979. That does not, however, in our judgment deprive the trial judge of the discretion to fashion workable relief where he finds a violation justifying it.

To effectuate the Act's purposes Congress has granted broad discretion to the district courts in fashioning relief for violations of Title VII. If a company did not comply with the Act, it is not unreasonable for the court to require the defaulting company to pay the benefits that should have been paid and to restrain the company from canceling other benefits for a reasonable time. Restraining the company from canceling other benefits prevents it from placing the burden of its noncompliance on the other employees. We conclude, however, that the order should not have been of unlimited duration.

■ The purpose of the Act is to remove discrimination but not to dictate terms of employment which are not otherwise discriminatory. We do not believe that the one year period was intended to make the court and the Company permanent partners in the adjustment of fringe benefits. Nor was it meant to indicate just what the level of such benefits should be so long as they are not discriminatory on account of sex as now defined in the pregnancy amendments. It is clear that the one year period in the statute was designed, as the EEOC maintains, to allow the employer experience in administering fringe benefits in accordance with the Act without disturbing the status quo for a year. In a year's time it would be possible to gain experience and perhaps, as Senator Williams sensibly opined, management would overcome any initial skepticism or concern that the legislation would be unduly burdensome.

Here it seems to us from the findings made by the trial judge, that the parties acted at all times in good faith. They believed that the Association was an independent body not subject to the constraints of Title VII and that the Company was not violating the law. Thus while we have found, as did the district judge, that the Company was wrong in participating in the Association, the history and nature of the participation do not suggest that it has been guilty of such bad faith that it should be deprived of its normal managerial discretions indefinitely. It would therefore seem to us that the injunction compelling continuation of disability benefits could be reasonably limited to the same one year period which Congress felt was suitable for companies that voluntarily complied when the Act was first made effective. Many of the same considerations which would make such a period useful at that time suggest themselves here. The one year time period is not a commandment of the statute but instead results from a consideration of the good sense and wisdom which Congress applied in enacting it.

Undoubtedly discussions will have to take place between the management and the Association; they will have to decide how they wish to continue their respective roles in the Association. The Company must underwrite the payment of disability benefits to women who become entitled to payments under the decree, and will have to do so for at least a year after any decree becomes final. However, it can determine whether it wishes to continue to make these benefits itself or whether it wishes to work with the Association to incorporate such benefits into the Association's disability benefit plan, and if the latter, what share should be borne by the Company and what should be borne by employee contributions. As Senator Williams suggested in discussing the pregnancy amendments the impact may not be as onerous as suspected.[3]

### D. The Prejudgment Interest

■ Finally, Wooster Brush complains of the trial judge's award of prejudgment interest. The Company cites *Macey v. World Airways, Inc.,* 13 Empl.Prac.Dec. ¶ 11,581 (N.D.Cal.1977), as authority for the idea that interest on a backpay award is not appropriate because it cannot be determined with any degree of accuracy how much work or overtime the plaintiff would have accumulated during any particular period. However that may be, the circumstances here are quite different. First, the amount of benefits payable under the plan are easily ascertainable; the period of disability payments and those entitled thereto have been fixed by stipulation. In addition, the practice of awarding prejudgment interest in backpay awards has become reasonably common.

In *Taylor v. Phillips Industry, Inc.,* 593 F.2d 783 (7th Cir.1979), interest was denied, but the Seventh Circuit observed that the matter of awarding such interest was well

---

**3.** "Mr. President, the committee found that the cost of equal treatment of pregnancy has been greatly exaggerated. It is likely that employers will find, after some experience, that the cost of equality in this regard is not significant; and the impetus to alter benefit packages for this reason will disappear." 123 Cong.Rec. 29,385 (daily ed. Sept. 15, 1977).

within the discretion of the trial court. The basis for allowing interest lies of course in Title VII's remedial provisions which "are intended to give courts wide discretion in exercising their equitable powers" to restore aggrieved persons to where they would have been were it not for the unlawful discrimination. The rule of our circuit seems to be that an award of prejudgment interest should stand in the absence of an abuse of discretion. *Bricklayers Pension Trust Fund v. Taiariol,* 671 F.2d 988 (6th Cir.1982). In *Bricklayers* our court upheld what it characterized as the general rule that in the absence of a statutory provision to the contrary, the award of prejudgment interest is a matter addressed to the discretion of the court. The trial judge did not abuse his discretion in deciding to award interest.

Likewise, the calculation of the rate of interest awarded was not improper. The proper rate of both prejudgment and postjudgment interest awards has been a subject of great discussion and becomes one of particular importance during periods of change in the value of the dollar and in the prevailing interest rates. Thus in California a district court has recently awarded interest tied to the prime rate. *EEOC v. Pacific Press Publishing Association,* 482 F.Supp. 1291 (N.D.Cal.1979) (interest was awarded based upon the adjusted prime rate as used by the Internal Revenue Service). In *Richardson v. Restaurant Marketing Associates,* 527 F.Supp. 690 (N.D.Cal. 1981), another district court awarded interest at the rate of ninety percent of the average prime rate for the year in which the quarter occurs. In *North Cambria Fuel Co. v. NLRB,* 645 F.2d 177 (3d Cir.), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 110 (1981), the concerns of fluctuating interest rates and inflation prompted the National Labor Relations Board to fix an interest rate of twelve percent. The court in *North Cambria* noted that the Board's interest rate was related to the employer's cost of borrowing. The rate therefore furthered the Board's objective of preventing employers from borrowing from employees instead of paying backpay

awards promptly and, at the same time, was relatively responsive to the going rates in the commercial market.

We note that since the judgment appealed from the Congress has amended 28 U.S. C.A. § 1961(a) (West Supp.1983) to provide a rate for postjudgment interest as follows:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

All of the foregoing suggest to us that the matter of prejudgment interest remains essentially one for the discretion of the trial judge. Undoubtedly in the future, district courts may be influenced by the congressional wisdom expressed in the amendment of 28 U.S.C. § 1961(a), but we do not think that they are invariably compelled to adopt the statutory postjudgment rate in determining prejudgment interest.

### IV.  Conclusion

In affirming the judgment of the district court in part and reversing in part we have held: (a) The Wooster Brush Company, by participating through contributions and administrative support in the disability program of the Association, discriminated against employees on the basis of their sex where the result of such contributions was to make possible a benefit plan which failed to include benefits for pregnancy disability. (b) The Company is therefore liable to make good the loss of those 25 female employees who, it is stipulated, were deprived of such

benefits and for any other employees who have been similarly deprived since the judgment. (c) The employees Association, a separate bona fide legal entity, is not an employer within the meaning of the Act and is not liable directly for the payment of benefits to the female employees who have been discriminated against by reason of the operation of the plan. Nothing herein however prevents any arrangement between the Company and the Association for the payment of such benefits out of either Association or Company funds in a way they find mutually satisfactory. (d) The injunctive relief shall be limited to Wooster Brush Company. The Company shall be enjoined from participating in any plan of disability benefits which does not include a provision for pregnancy disability unless the Company makes good on its own the plan's failure to provide pregnancy disability benefits. In addition, the Company shall be enjoined from allowing any disability benefits to be reduced for a period of one year after these proceedings become final, absent any specific showing of good cause why such provisions should not be modified.

Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.