### Mary TUCK,

v.

### HCA HEALTH SERVICES OF TENNESSEE, INC., d/b/a HCA Donelson Hospital.

No. 3–91–0222.

United States District Court, M.D. Tennessee, Nashville Division.

June 4, 1992.

Frank Steiner, Ann Buntin Steiner, Steiner & Steiner, Nashville, TN, for plaintiff.

Robert Earl Boston, Waller, Lansden, Dorth & Davis, Mark E. Edwards, Nashville, TN, for defendants.

## MEMORANDUM

HIGGINS, District Judge.

This action was tried without the intervention of a jury on the plaintiff's claim for discriminatory discharge, in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Having considered the evidence and the entire record, the Court makes the following findings of fact and conclusions of law.

### I. FACTS AND PROCEDURAL HISTORY

The plaintiff, Mary Tuck, began working at Donelson Hospital in 1979 as a registered nurse. Mrs. Tuck worked both as a registered nurse and as a charge nurse in several different wards of the hospital during the years that followed. As a charge nurse on the orthopedic ward, Mrs. Tuck took reports on the patients, made assignments for the registered nurses on the ward, made rounds with the doctors, and generally supervised the work of the other nurses and assisted them when required. From 1979 to 1988, Mrs. Tuck received annual evaluations from her supervisors ranging from "good to very good" to "outstanding." She was named the hospital's Employee of the Month for September, 1985.

Mrs. Tuck injured her upper and lower back in a work-related incident on February 16, 1989. Her doctor allowed her to return to work performing light duties. Donelson Hospital placed Mrs. Tuck on the orthopedic ward as a charge nurse, which, as described above, is mostly a managerial and supervisory position. However, due to the severity of her back injuries, Mrs. Tuck was admitted to Donelson Hospital on March 14, 1989, where Dr. Don Gaines performed surgery. The surgical procedure included a laminectomy, a partial facetectomy, a foraminotomy, removal of her fourth lumbar disc, and a bone fusion.

Dr. Gaines determined that Mrs. Tuck had a 15 percent permanent physical impairment to the body as a whole due to her back injuries, and a permanent disability to the body as a whole of 37½ percent. After the surgery, Mrs. Tuck was required to wear a back brace at all times, except while bathing. On December 5, 1989, Dr. Gaines altered his orders, requiring Mrs. Tuck to wear the back brace only on car trips or when she was outside or bending over. Dr. Gaines did not allow Mrs. Tuck to return to work after the surgery until early in 1990. On January 18, 1990, he wrote a release restricting her to light duty for two months. Other than this restriction to light duty, Dr. Gaines did not place any specific restrictions on Mrs. Tuck's activities.

When Mrs. Tuck returned to work, she gave the hospital Dr. Gaines' release and informed the hospital that she could not do any heavy lifting, bending, pushing or pulling. Prior to her extended leave of absence, Mrs. Tuck had worked as a charge nurse on the orthopedic ward, working an eight hour shift. However, since that position had been filled during her absence, Mrs. Tuck was assigned as a staff nurse on the Progressive Care Unit, working a twelve hour shift. Cathy Parrish, the Chief Nursing Executive, and Ruth Harkreader, the clinical coordinator, discussed the nursing positions available at the time, and decided that the Progressive Care Unit was the best place for Mrs. Tuck. According to Ms. Parrish, the nursing station was centralized, the halls were shorter, there were only fourteen beds, and the other nurses were to help Mrs. Tuck with any lifting while she helped them with their less physically strenuous tasks.

Mrs. Tuck worked on the Progressive Care Unit from February to March 27, 1990, when she was terminated. She was unaware of any complaints about her work, and there were no written complaints or reprimands in her employee file. However, apparently, the other nurses on the ward complained that Mrs. Tuck was not helping them with their tasks although they were helping her with heavy lifting.

On the night of March 23, 1990, Mrs. Tuck, Nell Sergeant, and a third nurse who called in sick, were scheduled to work the 7:00 p.m. to 7:00 a.m. shift. There were initially ten patients in the ward, and four more were admitted during the night for a total of fourteen. Charlene Reagan, the shift coordinator, was notified that the third nurse had called in sick. She attempted to call in an additional nurse to assist Mrs. Tuck and Ms. Sergeant. She was unsuccessful, and assisted Mrs. Tuck and Ms. Sergeant to the best of her ability, given her other duties in the hospital, throughout the remainder of the shift.

After this shift, Mrs. Tuck next worked the 7:00 p.m. to 7:00 a.m. shift on March 26–27, 1990. When she got off work that morning, she was terminated by the hospital. According to the termination interview form, Mrs. Tuck was "unable to perform expected staff nurse duties on progressive care due to her inability to do any lifting or pushing or to walk the length of the hall 'due to pain in her leg.'"

On March 27, 1991, Mrs. Tuck filed this action alleging violations of the Rehabilitation Act of 1973 (29 U.S.C. § 794), 42 U.S.C. § 1983, and the Tennessee Human Rights Act (Tenn.Code Ann. § 4–21–101 et seq.). A claim for retaliatory discharge was added subsequently. The Court granted defendant's motion for summary judgment on the retaliatory discharge claim. The Tennessee Human Rights Act claim was tried before a jury on February 4–7, 1992. The jury found for the plaintiff, and awarded damages in the amount of $26,755.00. The Rehabilitation Act claim was tried before the Court, and is the subject of this memorandum and order.

## II. DISCUSSION

### A. *The Rehabilitation Act of 1973*

Section 504 of the Act, codified at 29 U.S.C. § 794 (1988), requires in pertinent part that: "No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." The elements of a cause of action under the Act are:

> (1) The plaintiff is a 'handicapped person' under the Act; (2) The plaintiff is 'otherwise qualified' for participation in the program; (3) The plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*Doherty v. Southern College of Optometry,* 862 F.2d 570, 573 (6th Cir.1988), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) (citations omitted). In the present case, the parties have stipulated that Mrs. Tuck is handicapped[1] and that Donelson Hospital receives federal financial assistance. Therefore, the sole remaining elements at issue are whether Mrs. Tuck is "otherwise qualified" and whether she was discriminated against "solely by reason of [her] handicap." *Doherty,* 862 F.2d at 573. In addition, the defendant argues that Mrs. Tuck failed to exhaust her administrative remedies before filing suit, and therefore that she cannot prevail on her claim as a matter of law. The Court will take up this threshold matter first.

### (1) *Administrative Remedies*

■ Donelson Hospital argues that Mrs. Tuck was required to exhaust available statutory or regulatory administrative remedies before bringing suit under section 504. This would be true if Mrs. Tuck were employed by the federal government. However, Mrs. Tuck is employed instead by a private em-

ployer which receives federal financial assistance. The two Sixth Circuit cases cited by the defendant in support of its position involve Postal Service employees suing the Postal Service. *See Hall v. United States Postal Serv.,* 857 F.2d 1073 (6th Cir.1988); *Smith v. United States Postal Serv.,* 742 F.2d 257 (6th Cir.1984). The Court in *Smith,* examining the legislative intent of the statute, found it "clear that handicapped employees have the right to sue *federal employers* under the Act 'subject of course to the provisions for exhaustion of administrative remedies and other rules for procedures set forth in Title VII.'" *Smith,* 742 F.2d at 261 (emphasis added) (quoting 124 Cong.Rec. 30,347 (1978) (remarks of Sen. Cranston)).

In the context of private employers and private employees, however, there is no exhaustion requirement. When the Act was first promulgated there was no provision for a private right of action. However, in 1978 Congress amended the Act to provide a private right of action. Handicapped federal employees were given the "remedies, procedures, and rights" of Title VII of the Civil Rights Act of 1964, *see* 29 U.S.C. § 794a(a)(1), and were required to exhaust administrative remedies just like other claimants under Title VII. *Byers v. Rockford Mass Transit Dist.,* 635 F.Supp. 1387, 1389 (N.D.Ill.1986). Handicapped employees who work for recipients of federal financial assistance, on the other hand, were given the "remedies, procedures, and rights" of Title VI of the Civil Rights Act of 1964, *see* 29 U.S.C. § 794a(a)(2), and were not required to exhaust administrative remedies. *Byers,* 635 F.Supp. at 1389. As the court in *Byers* explained:

> Section 504 administrative regulations, like those of Title IX, were modeled after Title VI and are designed primarily to force compliance with the Rehabilitation Act through threatened cut-off of federal assistance. It is this correlation of administrative schemes that has lead the courts to hold that exhaustion is not a prerequisite to private enforcement of Section 504.

1. The defendant argues that "[a] temporary handicap is not within the protection of § 504 of the Act." However, the Court does not find it necessary to address this issue, since the defendant has stipulated that the plaintiff is handicapped for the purposes of the Act.

*Id.* at 1390; *see also Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 631, 104 S.Ct. 1248, 1252–53, 79 L.Ed.2d 568, 575 (1984); *Greater Los Angeles Council on Deafness, Inc. v. Community Television of So. Cal.,* 719 F.2d 1017, 1021 (9th Cir.1983), *cert. denied sub. nom Gottfried v. United States,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *cf. Cannon v. University of Chicago,* 441 U.S. 677, 706 n. 41, 99 S.Ct. 1946, 1962 n. 41, 60 L.Ed.2d 560, 581 n. 41 (1979) (no requirement of exhaustion of administrative remedies prior to filing suit under Title IX). Therefore, the Court finds that Mrs. Tuck had no duty to exhaust administrative remedies before filing suit.

### (2) *"Otherwise Qualified"*

■ The Supreme Court has defined an "otherwise qualified" handicapped person in the workplace as "one who can perform 'the essential functions' of the job in question. When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions."[2] *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 288 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307, 321 n. 17 (1987) (citations omitted); *Doherty,* 862 F.2d at 574–75.

In determining whether the handicapped employee is "otherwise qualified" for the job, the court "will need to conduct an individualized inquiry and make appropriate findings of fact." *Id.* 480 U.S. at 287, 107 S.Ct. at 1131, 94 L.Ed.2d at 320. The Eleventh Circuit stated the court's duty as follows:

> While legitimate physical qualifications may be essential to the performance of certain jobs, both that determination and the determination of whether accommodation is possible are fact-specific issues. The court is obligated to scrutinize the evidence before determining whether the

defendant's justifications reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives, or whether they are simply conclusory statements that are being used to justify reflexive reactions grounded in ignorance or capitulation to public prejudice.

*Arline v. School Bd. of Nassau County,* 772 F.2d 759, 764–65 (1985), *aff'd,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (citations omitted); *Hall,* 857 F.2d at 1078–79.

Donelson Hospital argues that Mrs. Tuck was not able to perform all of the essential duties of a registered nurse at the hospital since she could not do any heavy lifting, bending, pushing or pulling. The hospital relies on the written job description for a staff nurse which requires all registered nurses to be able to lift between fifty and 100 pounds as an essential element of their job. The Court's fact-specific inquiry, however, "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall,* 857 F.2d at 1079.

Ms. Odis D. Hall, the plaintiff in the Sixth Circuit case *Hall v. United States Postal Serv., supra,* was not hired as a distribution clerk by the Postal Service because she could not lift the seventy pounds required by the Postal Service's job description. The district court found the job description controlling and granted summary judgment for the Postal Service. The Court of Appeals reversed and remanded, having concluded that Ms. Hall "raised a legitimate factual dispute as to whether the 70 pound lifting requirement was indeed essential." *Id.* Ms. Hall had prior experience as a clerk with the Postal Service, and had neither done any heavy lifting herself nor had she observed others doing any heavy lifting. *Id.* The Court of

---

**2.** [W]e can no longer take literally the assertion of [*Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980, 988 (1979)] that 'an otherwise qualified person is one who is able to meet *all* of a program's requirements in spite of his handicap.' The question after [*Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83

L.Ed.2d 661 (1985)] is the rather mushy one of whether some 'reasonable accommodation' is available to satisfy the legitimate interests of both the grantee and the handicapped person. *Brennan v. Stewart,* 834 F.2d 1248, 1261–62 (5th Cir.1988), *quoted in Doherty,* 862 F.2d at 575 (citation omitted) (emphasis added by court in *Doherty* ).

Appeals also stated that what constitutes an "essential" element of the job is a legal conclusion for the court after it conducts its "individualized inquiry," not a conclusion for the employer to make. *Id.*

■ An accommodation is not reasonable if it requires eliminating an essential element of the job; and an employer is not required to eliminate an essential element of the job to accommodate a handicapped employee. *Hall,* 857 F.2d at 1078. Similarly, "[a]n accommodation is not reasonable, and therefore will not be required, if, for instance, it imposes an undue hardship upon the operation of the ... employer." *Id.* at 1080. However, not *"every* accommodation relating to an essential function of a position necessarily *eliminates* that function." *Id.* (emphasis original).

The applicable regulations outline, in pertinent part, an employer's duty to make reasonable accommodations:

§ 84.12 Reasonable accommodation.

(a) A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include: (1) Making facilities used by employees readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions.

(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of a recipient's program, factors to be considered include:

(1) The overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget;

(2) The type of the recipient's operation, including the composition and structure of the recipient's workforce; and

(3) The nature and cost of the accommodation needed.

(d) A recipient may not deny any employment opportunity to a qualified handicapped employee or applicant if the basis for the denial is the need to make reasonable accommodation to the physical or mental limitations of the employee or applicant.

45 C.F.R. § 84.12 (1991); *see also Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17, 94 L.Ed.2d at 321 n. 17; *Hall,* 857 F.2d at 1080.

With these principles in mind, the Court must now determine whether Mrs. Tuck could perform the essential functions of a registered nurse at Donelson Hospital without any accommodation by the hospital. If she could not, the Court must then determine whether she could perform the essential functions with reasonable accommodation by the hospital.

The Court finds that Mrs. Tuck could not perform all the essential duties of a registered nurse at Donelson Hospital, at least on the Progressive Care Unit, without reasonable accommodation by the hospital. Mrs. Tuck's biggest limitation was her inability to lift heavy objects, such as patients. Patients in the Progressive Care Unit require considerable attention, and often need to be lifted from their bed. In addition, the nurses in the Progressive Care Unit work longer, twelve-hour shifts, instead of the eight-hour shifts available in other wards of the hospital.

However, the Court finds that Mrs. Tuck was "otherwise qualified" for the position of a registered nurse at Donelson Hospital, and could have performed adequately the essential functions of the job with reasonable accommodations by the hospital. The Court is also of the opinion that the hospital did not make reasonable accommodations for Mrs. Tuck. While Mrs. Tuck was working on the Progressive Care Unit, and at the time she was terminated, the hospital was advertising for nurses to fill positions on several different wards (including MCCU, SICU, cardiac stepdown, medical/oncology, medical/pediatric, surgical, orthopedics, and special care nursery). In addition, these registered nursing positions were for "full time, part time

... on all shifts, both 8 and 12 hour compensation. We also have some 4 and 6 hour shifts available." The hospital did not offer any of these open positions to Mrs. Tuck.[3] Nor has the hospital shown that placing Mrs. Tuck in any of these other positions or making any other accommodations for her would have imposed an undue hardship on it.

### (3) *Reason for Discharge*

■ For Donelson Hospital to be in violation of the statute, it must have also "excluded [Mrs. Tuck] from participation in, ... denied [her] the benefits of, or ... subjected [her] to discrimination under the program solely by reason of [her] handicap." *Doherty*, 862 F.2d at 573. For the reasons discussed below, the Court finds that Donelson Hospital did discriminate against Mrs. Tuck "solely by reason of [her] handicap." *Id.*

When Mrs. Tuck had worked at the hospital before her back injury and leave of absence, she had received annual performance evaluations from her superiors ranging from "good to very good" to "outstanding." In addition, she had been named the hospital's Employee of the Month for September 1985. In the letter from Mr. Ed Steinback, the hospital's administrator, to Mrs. Tuck informing her of the award, Mr. Steinback stated that she had been chosen for the award "because you consistently represent the best qualities of a hospital employee. These qualities include reliability, positive attitude, good grooming, loyalty to your department and Donelson Hospital, and the good relationship you have with your co-workers." There were no reprimands or other negative reports in Mrs. Tuck's employee file either before or after her leave of absence.

When Mrs. Tuck returned to work after her leave of absence, Ruth Harkreader was the clinical coordinator on the Progressive

Care Unit. Kathlene Graves replaced her as clinical coordinator on March 7, 1990. The clinical coordinator is in charge of hiring and firing the nurses on the unit, as well as scheduling and other duties. Before terminating Mrs. Tuck, Ms. Graves spoke with other nurses on the Progressive Care Ward about Mrs. Tuck's job performance, and with Mr. Stahlman, the Director of Human Resources. She did not speak with Mrs. Tuck, or check with her doctor about Mrs. Tuck's physical restrictions. Instead, she relied on the fact that the original note from Dr. Gaines placing Mrs. Tuck on light duty for two months had expired. In other words, since Mrs. Tuck technically was no longer on light duty, at least in Ms. Graves' opinion, and Mrs. Tuck was not able to perform all the duties of a non-handicapped registered nurse, she was terminated. She was fired because of her handicap.[4]

## III. DAMAGES

Mrs. Tuck requests damages including: back pay; the difference between her salary at her current job and at Donelson Hospital between the time of trial and her reinstatement; reinstatement with all accumulated benefits (or front pay in lieu of reinstatement); prejudgment interest; and attorney fees.

■ As the Court has previously discussed,[5] private plaintiffs in a suit under § 504 are entitled to the "remedies, procedures, and rights" of Title VI of the Civil Rights Act of 1964. *See* 29 U.S.C. § 794a(a)(2). In *Guardian's Ass'n. v. Civil Serv. Comm'n. of City of N.Y.*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), a majority of the Supreme Court, in several separate opinions, held that plaintiffs in a Title VI case do not need to prove discriminatory intent to recover damages. *Id.* at

---

**3.** The Court notes that Perry Stahlman, the hospital's Director of Human Resources, stated in his deposition that Mrs. Tuck was not offered any job with a shift shorter than twelve hours because "[t]here weren't any vacant...." Deposition of Perry Stahlman at 29 (filed January 30, 1992; Docket Entry No. 25).

**4.** Donelson Hospital claims that plaintiff's employment was terminated by Defendant as a re-

sult of Plaintiff's inadequate job performance, and not merely as a result of her handicap. However, the Court notes that the Payroll Action Form, in the area entitled "complete only at termination," lists Mrs. Tuck's quality of work, quantity of work, character, general efficiency and initiative as "good," and her attendance as "fair."

**5.** *See supra* text at p. 992.

584, 103 S.Ct. at 3223, 77 L.Ed.2d at 870. However, "in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs; unless discriminatory intent is shown, declaratory and limited injunctive relief should be the only available private remedies for Title VI violations." *Id.* The plaintiff in this case, Mrs. Tuck, has neither alleged nor proven intentional discrimination by the defendant, Donelson Hospital.

 The "declaratory and limited injunctive relief" allowed by the Supreme Court in *Guardian's Ass'n.* has been interpreted to include back pay, *Darrone,* 465 U.S. at 631, 104 S.Ct. at 1252–53, 79 L.Ed.2d at 575, as well as attorney fees. 29 U.S.C. § 794a(b) (1985). However, most courts which have addressed the issue have not interpreted the relief to include compensatory damages for pain and suffering, reinstatement with seniority, return of lost pension benefits, or punitive damages.[6] *Eastman v. Virginia Polytechnic Inst.,* 939 F.2d 204, 209 (4th Cir. 1991); *Rivera Flores v. Puerto Rico Tel. Co.,* 776 F.Supp. 61, 71 (D.P.R.1991); *Longoria v. Harris,* 554 F.Supp. 102, 107 (S.D.Tex.1982).

Therefore, the Court will order the immediate reinstatement of Mrs. Tuck as the most appropriate form of relief in her Rehabilitation Act claim. In addition, the Court awards Mrs. Tuck prejudgment interest[7] at 10 percent per annum from the date demand for restitution was first made until the start of trial. *Shearson/American Express, Inc. v.*

*Mann,* 814 F.2d 301, 307 (6th Cir.1987). The Court finds that Mrs. Tuck first made a demand for restitution in her complaint filed March 27, 1991. Finally, the Court awards Mrs. Tuck reasonable attorney fees as provided by the Act.

An appropriate order shall be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the Court finds in favor of the plaintiff, and against the defendant, on plaintiff's claim for discriminatory discharge in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

The defendant shall reinstate the plaintiff immediately in an equivalent position with all accumulated salary rights and benefits as if she had been continuously employed.

The Court further awards Mrs. Tuck reasonable attorney fees and costs. An application for fees and costs shall be submitted as provided in the Local Rules of Court.

The Clerk is directed to enter judgment on the jury verdict on the plaintiff's claim under the Tennessee Human Rights Act and as provided in this order on plaintiff's claim under the Rehabilitation Act.

It is so ORDERED.

---

**6.** *But see Miener v. Missouri,* 673 F.2d 969 (8th Cir.), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982) (permitting a plaintiff to recover a broad range of compensatory damages under § 504); John D. Briggs, *Safeguarding Equality for the Handicapped: Compensatory Relief Under Section 504 of the Rehabilitation Act,* 1986 DUKE L.J. 197 (arguing for compensatory relief in all cases of violations of § 504). This Court agrees with the Fourth Circuit, however, "that § 504 and Title VI were not meant to create new species of statutory torts, complete with a full array of monetary remedies." *Eastman,* 939 F.2d at 208. The most persuasive argument for limiting the damages available under § 504 are the types of damages available under § 505 for federal employees. Section 505(a)(1)

> incorporates the rights and remedies of Title VII.... [which] is limited to equitable relief, including injunctions and back pay.... Since it is clear that § 504 also reaches claims of employment discrimination, there is an over-

lap between the two provisions with regard to federal employees. If § 504 allowed a plaintiff to seek damages, alternative remedies for the same violation committed by the same employer would result.... Moreover, even if § 501 [which is enforced by § 505(a)(1) ] were meant to provide the sole avenue of redress for a federal employee, affording a greater remedy under § 504 would base differing damage awards on the nature of the disabled individual's employment.

*Rivera Flores,* 776 F.Supp. at 68.

**7.** "In *Bricklayers [Pension Trust Fund v. Taiariol,* 671 F.2d 988 (6th Cir.1982) ] our court upheld what it characterized as the general rule that in the absence of a statutory provision to the contrary, the award of prejudgment interest is a matter addressed to the discretion of the court." *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n.,* 727 F.2d 566, 579 (6th Cir.1984).