Anthony E. CEFALI, et al., Plaintiffs,

v.

BUFFALO BRASS COMPANY, INC., et al., Defendants.

Civ. No. 87–102L.

United States District Court,
W.D. New York.

Sept. 24, 1990.

Willard M. Pottle, Jr., Buffalo, N.Y., for plaintiffs.

H. Kenneth Schroeder, Alexander C. Cordes, Buffalo, N.Y., Wayne C. Dabb, Cleveland, Ohio, for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

The ten named plaintiffs commenced this suit in 1987 against Buffalo Brass Company (Brass) and Atlantic Richfield Company (ARCO). Pursuant to a stipulation of settlement entered August 10, 1989, all substantive claims have been settled among the parties. The only issues that remain, pursuant to the stipulation of settlement, concern plaintiffs' application for attorneys fees and prejudgment interest as well as a counterclaim by defendants for damages for breach of a covenant not to sue by some of the plaintiffs. As not infrequently happens, the litigation concerning these ancillary issues has been at least as contentious as the prosecution of the substantive claims. Unfortunately, "like Frankenstein's monster" the fee application has

taken on a life of its own. *See Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1054 (2d Cir.1989) (Chambless II). This dispute over severance benefits was ultimately settled in August 1989 with a total net payment of approximately $200,000.00 to be shared by the ten plaintiffs. This was only about $50,000.00 more than the plaintiffs had been offered by Brass when they were fired four years earlier in 1985. Nevertheless, this case has spawned numerous motions and cross-motions relating to fees and sanctions so that plaintiffs now seek a total award of $150,-000 total attorneys fees for the action which includes approximately $47,000 for attorneys fees and costs incurred in connection with litigating the fee application. Plaintiffs also request approximately $70,-000.00 prejudgment interest on the settlement amount.

### A. BACKGROUND

In 1985, defendant Brass purchased certain assets of defendant ARCO. Pursuant to this sale, plaintiffs, all of whom had been ARCO employees, were transferred to Brass. Within days after the sale, however, all ten plaintiffs were terminated by Brass.

Brass offered plaintiffs benefits under its severance plan, which provided for, among other things, the payment of two weeks' salary per year of service with Brass and its predecessor. The minimum benefit payable under the plan was two weeks' salary. Brass prepared benefit packages totalling approximately $145,-000.00 for the ten employees.

In contrast, the ARCO severance plan provided for three weeks' salary per year of service, with a minimum benefit of thirteen weeks' salary. Basically, it was this difference in severance benefits that precipitated this litigation.

Plaintiffs were told that to receive severance benefits, they would have to execute releases in favor of Brass. The releases said nothing about plaintiffs' rights, if any, with respect to ARCO. After consulting with their attorney, Willard M. Pottle, Jr., Esq. ("Pottle"), six of the plaintiffs (the

"Cefali plaintiffs") either refused to sign the releases or signed them "under protest." Brass refused to accept the releases signed under protest. The Cefali plaintiffs consequently received no benefits. The other four plaintiffs, Niles, Paa, Schabio and Siarkowski, (the "Niles plaintiffs") signed the releases and did receive benefits. Subsequent to these events, plaintiffs instituted a number of lawsuits in state and federal court against defendants, which are outlined below.

## B. HISTORY OF THE LITIGATION

### 1. Cefali Plaintiffs' RICO Action

On February 18, 1986, the Cefali plaintiffs began an action in this district (Civ. No. 86–157C). The suit was based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") and a state law claim for breach of contract. The RICO claim was essentially predicated on the theory that defendants conspired to defraud plaintiffs in order to deny them severance and other benefits to which they were entitled. Defendants' motions to dismiss were granted on October 8, 1986, on the ground that plaintiffs had failed to allege a pattern of racketeering activity under the RICO statute. Plaintiffs did not appeal that order of dismissal.

### 2. Niles Plaintiffs' RICO Action

The Niles plaintiffs filed a suit similar to the Cefali RICO action on October 7, 1986 (Civ. No. 86–947C). In light of the dismissal of the Cefali RICO suit, on October 31, 1986, this case was dismissed on plaintiffs' own motion.

### 3. State Court Suits

In separate actions instituted on October 2, 1986, the Cefali and Niles plaintiffs sued defendants in Erie County Supreme Court, asserting various state law claims. These actions were commenced while the federal RICO action was still pending. After the instant lawsuit was commenced four months later, the state cases were stayed on February 13, 1987 on the agreement of the parties. Both suits were later dismissed as a result of the settlement of the instant case.

### 4. ERISA Action

In the case at bar, all ten plaintiffs sued under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), as well as several pendent state law theories. This action was commenced on February 3, 1987. In the ERISA claims, plaintiffs sought severance benefits under the ARCO plan. Plaintiffs originally sought to bring the suit as a class action, but the class certification motion was denied. Summary judgment was also granted in favor of Brass on all claims by the Niles plaintiffs because they had signed releases and had received benefits, as well as on Brass' counterclaim against the Niles plaintiffs for breach of covenant not to sue. In addition, both defendants were granted summary judgment as to all the pendent state claims.

The case was settled when plaintiffs eventually filed claims for benefits directly with ARCO, and ARCO agreed to pay benefits under its severance plan. ARCO's total net benefit package and other payments totalled approximately $200,000. Under an agreement between Brass and ARCO, Brass partially reimbursed ARCO for the benefits paid. Pursuant to the settlement, the case was dismissed on August 10, 1989, except for the claims that were reserved.

Plaintiffs subsequently moved against both defendants for attorney's fees under ERISA, 29 U.S.C. § 1132(g), and for sanctions against Brass under Fed.R.Civ.P. 11. Plaintiffs also seek an award of prejudgment interest on the amount they received under the settlement. In addition, Brass has moved for attorneys' fees on plaintiffs' class action motion and for a determination of damages in connection with its counterclaim against the Niles plaintiffs. ARCO has not moved for fees.

## C. THE MOTIONS

### 1. Brass's Motion for Attorneys' Fees as

*to the Class Certification Motion* [1]

In this motion, Brass requests an award of fees against all plaintiffs and/or their attorney under 28 U.S.C. § 1927 and Fed.R. Civ.P. 11. Brass alleges that plaintiffs' class certification motion was frivolous and untimely, and that the only supporting papers consisted of two incompetent and irrelevant affidavits. Brass states that it incurred $15,097.50 in fees opposing the motion.

Section 1927 provides that an attorney whose conduct unreasonably and vexatiously multiplies the proceedings in a case may be required to pay excess costs, expenses and attorneys' fees reasonably incurred because of the attorney's conduct. Similarly, Rule 11 allows the court to require an attorney or a party to pay to an opposing party the amount of the reasonable expenses incurred because of the filing of a pleading, motion, or other paper signed in violation of the Rule.

■ I find that the class certification motion, though it proved meritless, was not so unreasonable or obviously groundless as to warrant the imposition of attorneys' fees under either § 1927 or Rule 11. The record does not show that the motion was made in bad faith, which is a prerequisite to an award under § 1927. *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir. 1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Keeping in mind the Second Circuit's admonition that "the court is to avoid hindsight and resolve all doubts in favor of the signer," *id.* at 1275, the court is also not convinced that when the motion was made, it was so patently clear that it had absolutely no chance of success that Rule 11 sanctions are mandated. *Eastway Construction Corp. v. City of New York,* 762 F.2d 243 (2d Cir. 1985). Brass's motion is therefore denied.

### 2. Brass's Motion for Attorneys' Fees as to the Niles Plaintiffs

■ Brass also has moved for fees against the Niles plaintiffs and/or their attorney under 29 U.S.C. § 1132, 28 U.S.C. § 1927, and Rule 11. Brass contends that the Niles plaintiffs' claims against Brass were baseless and made in bad faith, because those plaintiffs had already released Brass from liability and received benefits from Brass. Brass allegedly incurred $23,-022.52 in fees defending against these claims.

As Brass acknowledges in its brief, it is also seeking attorneys' fees as *damages* on its counterclaim against the Niles plaintiffs for breach of the covenant not to sue. Brass states that its motion for fees is not intended to obtain a double recovery, but to provide alternative legal theories in support of its attempt to recover fees spent in defense of the Niles plaintiffs' claims. Although the court has fully considered Brass's arguments made in support of this motion, its claims regarding the Niles plaintiffs are adequately addressed by the court's decision on Brass' counterclaim for damages, *infra.* Even if I were to grant Brass' motion, I would award no more on the motion than I would on the counterclaim. Therefore, Brass's motion is denied.

### 3. Plaintiffs' Motion for Sanctions and Costs

■ In opposition to Brass's motions for attorneys' fees, plaintiffs contend that the only issues that were supposed to remain in the case after it was settled were plaintiffs' claims for fees and interest, and the issue of damages on Brass's counterclaim against the Niles plaintiffs. Therefore, plaintiffs argue, by moving for attorneys' fees, defendants are violating the dismissal order, and are acting in bad faith in order to pressure plaintiffs to drop or compromise plaintiffs' claims. Plaintiffs accordingly ask for Rule 11 sanctions and costs in defending these motions, in an amount to be determined by the Court.

In response, Brass contends that the only issues that have been settled are those relating to plaintiffs' substantive claims, and that there was no settlement of any

---

1. Plaintiffs' argument that the stipulation of dismissal deprived the court of jurisdiction over Brass's motions for attorneys' fees is discussed

in the portion of this decision dealing with plaintiffs' motion for sanctions against Brass, *infra.*

claims Brass has against plaintiffs. Therefore, Brass argues, the dismissal has not deprived the court of jurisdiction over Brass's attorneys' fees claims, because the case has only been partially dismissed.

I find that sanctions are not warranted on this claim. The stipulation of dismissal dismissed the claims of all plaintiffs except their claims for attorney's fees and interests. As to Brass, however, the stipulation merely said that the "Court shall retain jurisdiction over the Counterclaim of American Brass" against the Niles plaintiffs. The stipulation did not state whether Brass could bring any other claims for attorneys' fees or sanctions. There was, then, no express provision barring Brass's motion.

In addition, Brass does not appear to have been precluded as a matter of law for moving for fees and sanctions following entry of the dismissal order. In *Cooter & Gell v. Hartmarx Corp.*, — U.S. —, 110 S.Ct. 2447, 110 L.Ed.2d 359 (U.S.1990), the Supreme Court held that a voluntary dismissal under Rule 41(a)(1)(i) does not deprive a district court of jurisdiction over a Rule 11 motion. The Court reasoned that the imposition of a Rule 11 sanction is not a judgment on the merits of the action, but requires the determination of a collateral issue, which may be made after the principal suit has been terminated. *Id.* — U.S. —, 110 S.Ct. at 2455.

Though the Court in *Cooter* did not address itself to cases involving dismissals under Rule 41(a)(1)(ii), its rationale applies *a fortiori* to such cases. That view is reinforced by the Second Circuit's holding in *Barr Laboratories, Inc. v. Abbott Laboratories*, 867 F.2d 743 (2d Cir.1989), in which the Court of Appeals held that in order to encourage plaintiffs to discontinue untenable actions in the very early stages of the action, the filing of a notice of dismissal under Rule 41(a)(1)(i) deprives a court of all jurisdiction over an action, including the authority to impose sanctions. That holding, of course, was implicitly overruled in *Cooter*. Significantly, however, the court in *Barr* observed that when a case has been dismissed by stipulation pursuant to Rule 41(a)(1)(ii), "the policy of

encouraging the early dismissal of meritless actions cannot then be served." *Id.* at 747. The court suggested, therefore, that sanctions could be imposed following a stipulated dismissal. The subsequent *Cooter* decision consequently leaves little room for doubt that Rule 11 sanctions may be sought after a dismissal under Rule 41(a)(1)(ii).

There is no apparent reason why this rule should not also apply to motions under 28 U.S.C. § 1927. Like Rule 11, § 1927 involves a collateral matter not directly involving the merits of an action. The only difference between the two provisions is that Rule 11 "deals with the signing of particular papers in violation of the implicit certification invoked by the signature," whereas § 1927 imposes "a continuing prohibition against dilatory litigation ..." *Oliveri*, 803 F.2d at 1274. Just as a litigant should not be allowed to "purge his violation of Rule 11 merely by taking a dismissal," *Cooter*, — U.S. —, 110 S.Ct. at 2457, so a party who engages in dilatory tactics should not be permitted to escape the possibility of sanctions under § 1927 by agreeing to a settlement, especially since those very tactics might have driven the other party to the settlement table.

Accordingly, I find that Brass is not subject to sanctions for having moved for fees and costs after the stipulation of dismissal was entered. Plaintiffs' motion is therefore denied.

### 4. Plaintiffs' Motion for Attorney's Fees

In this motion, plaintiffs request $150,000 in attorney's fees and disbursements under 29 U.S.C. § 1132. The Cefali plaintiffs have made this motion against both defendants, and the Niles plaintiffs have moved against ARCO only.

Included in this request is an application for approximately $47,000 for fees incurred in litigating the fee issue. Plaintiffs seek approximately $23,000 for attorney Pottle, $21,000 for Mitchell Williams, Esq., the attorney hired by Pottle in December 1989 to prosecute the fee application as well as expert witness fees and disbursements of approximately $2,750.

Plaintiffs take the position that had it not been for their lawsuits, they would not have received benefits from ARCO. Plaintiffs argue that since their claims were eventually paid, they are "prevailing parties" in this case even though the case was settled. The Niles plaintiffs also contend that any amount they are required to pay on Brass's counterclaim should be added to the costs imposed on ARCO, so that in effect, ARCO would end up paying Brass.

In response to plaintiffs' motions, Brass argues that plaintiffs did not "prevail" against it, since only ARCO paid plaintiffs directly under the settlement agreement. Brass adds that even if plaintiffs prevailed on the ERISA claim, they can be assessed fees on their unsuccessful claims. Brass asserts that plaintiffs should not get fees for all the time their attorney spent representing them, but, if they are to receive any fees at all, they must distinguish between representation on the ERISA claims and on the unrelated, unsuccessful claims, such as the RICO claims.

Brass also argues that plaintiffs should have distinguished between fees incurred on behalf of the Cefali plaintiffs and fees incurred on behalf of the Niles plaintiffs, since the latter had no claim against Brass.

ARCO has not moved for fees, and takes no position on Brass's motion. As to plaintiffs' motion for fees and interest, ARCO contends that plaintiffs are not entitled to either, because ARCO is not an "offending" party under 29 U.S.C. § 1132. ARCO points out that it was Brass, not ARCO, that actually terminated plaintiffs. ARCO claims that the lawsuits against it were based on the erroneous notion that ARCO had singled plaintiffs out for termination even before plaintiffs were transferred to Brass. ARCO concedes that plaintiffs were entitled to benefits from ARCO, but states that ARCO promptly awarded benefits once plaintiffs filed claims for them, and would have done so sooner had plaintiffs filed their claims earlier.

### a. Attorney's Fees Under ERISA

■ Title 29 U.S.C. § 1132(g)(1) provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." In deciding whether to make such an award, the court must consider five factors: 1) the degree of the offending party's culpability or bad faith; 2) the ability of the offending party to satisfy an award of attorney's fees; 3) whether an award would deter others from acting similarly in like circumstances; 4) the relative merits of the parties' positions; and 5) whether the action conferred a common benefit on a group of pension plan participants or resolved a significant issue of law. *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir.1987) (*Chambless I*).

In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a case dealing with the Civil Rights Act fee statute, 42 U.S.C. § 1988, the Supreme Court set forth certain standards "applicable to all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Id.* at 433 n. 7, 103 S.Ct. at 1939 n. 7. Although the ERISA fee-shifting statute does not expressly limit fee awards to the prevailing party, case law has established that it is significant whether the fee applicant has prevailed. *See, e.g., Birmingham v. SoGen–Swiss Intern. Corp. Retirement Plan*, 718 F.2d 515, 523 (2d Cir.1983) ("attorney's fees may be awarded to the prevailing party under ERISA in the absence of some particular justification for not doing so"). Thus, the principles set forth in *Hensley* should be considered in ERISA cases as well. *See Chambless II*, 885 F.2d at 1058.

■ Plaintiffs may be considered prevailing parties "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939, *quoting Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978). This means that plaintiffs must at least "demonstrate a change in the legal relationship" between them and defendants as a result of the lawsuit. *Koster v. Perales*, 903 F.2d 131, 134 (2d Cir.1990). In other words, there must exist "a causal connection between the relief obtained and the

litigation in which the fees are sought." *Gerena–Valentin v. Koch*, 739 F.2d 755, 758 (2d Cir.1984). Such a connection exists if the suit was "a catalytic, necessary, or substantial factor in attaining the relief." *Id.* at 758–59, *quoting Commissioners Court of Medina County v. United States*, 683 F.2d 435, 440 (D.C.Cir.1982).

■ In addition, "relief need not be judicially decreed in order to justify a fee award ..." *Koster*, 903 F.2d at 134. When a plaintiff is afforded all or some of the relief sought by way of settlement, "the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor." *Hewitt v. Helms*, 482 U.S. 755, 761, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987).

■ After considering all of the relevant facts and the controlling law, I have determined that plaintiffs are entitled to recover attorney's fees as the prevailing party on the ERISA claim. I believe that fees are warranted because I am satisfied that the litigation—some of it—was causally related to the recovery of benefits under the settlement. Having reviewed the entire record, I find that the ERISA suit was a catalytic or substantial factor in plaintiffs' eventual recovery. *Gerena–Valentin*, 739 F.2d at 758–59.

As a "prevailing party" it is clear that under the ERISA statute, plaintiffs are entitled to some reasonable fee. Because ERISA is a remedial statute, a prevailing plaintiff with an ERISA claim should ordinarily get fees unless special circumstances would make it unjust. *See Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587 (9th Cir.1984); *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1356 (8th Cir.1980). That plaintiffs are entitled to some fee as a prevailing party on the ERISA claim does not, of course, mean that they are entitled to all fees claimed.

As the Supreme Court stated in *Hensley*, however, the finding that plaintiffs prevailed only brings plaintiffs across the threshold, for it remains to be determined what fee is reasonable. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. The Second Circuit has adopted the lodestar method for

determining the amount of the award. *Chambless II*, 885 F.2d at 1058–59. Under this approach, the court multiplies the compensable hours by a reasonable rate, and then makes any appropriate upward or downward adjustment.

■ The burden of establishing a reasonable rate is on the fee applicant. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939; *Chambless II*, 885 F.2d at 1059. In general, the rate should be calculated according to the prevailing rates in the community *"for similar services by lawyers of reasonably comparable skill, experience and reputation."* *Chambless II*, 885 F.2d at 1058–59 (emphasis in original), *quoting Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984). Thus, more than one market rate may prevail in a given area, particularly in urban locations with diverse legal communities. *Chambless II*, 885 F.2d at 1059.

The burden is likewise on the applicant to establish the number of hours worked. Where a fee applicant provides insufficient documentation to support the claimed hours, the award may be reduced accordingly. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. The initial fee calculation should also exclude hours that were not reasonably expended in that they were excessive, redundant, or otherwise unnecessary. *Id.* at 434, 103 S.Ct. at 1939.

Even after the court has determined the reasonable rate and hours, the inquiry is not ended, for other considerations may lead to an upward or downward adjustment of the award. One such consideration is the result obtained, which is "particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Id.* If this is the case, the court must first ask whether the unsuccessful claims were unrelated to those on which the plaintiff succeeded; if so, the unrelated claims should be treated as if they had been raised in separate lawsuits, and no fees should be awarded on them. *Id.* at 434–35, 103 S.Ct. at 1940. The second question is whether the plaintiff achieved a high enough level of success

that he should recover all of the fees requested even though he did not prevail on every contention raised in the lawsuit. *Id.*

These determinations, of course, cannot be made according to any precise rule or formula. They are therefore left to the discretion of the district court, which may attempt to identify specific hours that should be eliminated, or simply reduce the award to account for the limited success. *Id.* at 436–47, 103 S.Ct. at 1941–46. In short, the "bottom line" is that the amount of fees awarded should be reasonable in relation to the results obtained. *Id.* at 440, 103 S.Ct. at 1943.

■ In the case at bar, I find that plaintiffs' request for fees totalling $103,700 for 414 hours at a rate of $250 per hour from December 1985 until settlement in August 1989 is excessive and not justified on this record. For one thing, plaintiffs achieved only partial success at best. The unsuccessful RICO claim, and the state claims which were stayed, were not only unrelated to the successful ERISA claim, but prolonged rather than expedited recovery. In my view, there was no legal or factual basis for the RICO suits, and their prompt dismissal by Judge John T. Curtin confirms that. Since these claims had no causal relationship to plaintiffs' recovery, I have not counted any of the time spent on those claims, and have instead begun my calculation of the hours with January 21, 1987, the first date that "ERISA" is mentioned in Pottle's time records.

Plaintiffs are entitled to fees on the ERISA claim. I am not convinced, however, that plaintiffs' counsel ever considered the ERISA statute until well after his abortive RICO claims and other state claims had been dismissed. His time records do not specify any ERISA work until January 1987 and at the hearing on the fee application, plaintiffs' counsel did not convince the court that any of his activities before January 1987 were related to the ERISA claim. I do not believe the fee shifting statute was meant to award misguided and unproductive forays on claims and legal theories unrelated to the ERISA statute. Therefore, this unrelated activity should not be compensated by defendants.

Plaintiffs' counsel claims to have spent 414 hours from December 1985 until the case was finally settled in August 1989. By eliminating the hours spent on claims unrelated to the ERISA claim, I have reduced the hours to 318. This does not include hours spent after the settlement relating to the fee application which will be considered *infra.*

I also believe, however, that plaintiffs should not receive fees for all of those 318 hours, for a number of reasons. For one thing, considering the amount of time, expense, and effort spent in this litigation, the results ultimately achieved by plaintiffs were not much greater than if they had simply accepted the benefits offered under the Brass severance plan. The record indicates that the total amount payable to the ten plaintiffs under the Brass plan was $145,408. The net benefits provided under the ARCO plan pursuant to the settlement of the case totaled $218,750, but this was reduced by about $35,000, the sum already paid to the Niles plaintiffs by Brass. In addition, this gross amount will be further reduced or offset because of the court's decision to award damages to Brass because of the Niles' plaintiffs breach of the covenant not to sue. This issue will also be discussed, *infra.* Plaintiffs also received about $5,000 in consideration of the releases executed in connection with the settlement. When all these factors are considered, the actual net benefit to the ten plaintiffs was not substantial although the litigation continued for almost four years. The Supreme Court in *Hensley*, 461 U.S. at 434–436, 103 S.Ct. at 1940–41 has instructed that "the most critical factor" in determining the extent of the fee is the result, that is the success obtained because of the suit. The relatively modest success in this case does not warrant an award for the total fees sought by plaintiffs.

There are several other factors which compel a conclusion that plaintiffs are not entitled to the full award requested. Some of the work performed appears to be unnecessary, excessive and not well founded.

For example, the Niles plaintiffs' suit against Brass is intermingled with the ERISA action and was brought in contravention of the covenants not to sue. This time should be factored out of the equation. It is difficult to redact with precision work done solely for the Cefali plaintiffs as to both ARCO and Brass and work done for the Niles plaintiffs solely against ARCO. Although precision is difficult, it is clear that there should be some reduction from the total claim to reflect the fact that fees should not be recovered for work spent on behalf of the Niles plaintiffs against Brass because of the covenant not to sue.

In addition, all of plaintiffs' counsel's time is charged by him at the same rate. I do not sense that any "billing judgment" was used on this application. Courts have instructed that such a judgment should be used to exclude excessive and redundant fees. *Chambless II*, 885 F.2d at 1059. Counsel's time for even routine administerial chores is charged at the same rate as court appearances in federal court. Some adjustment must be made for this.

In addition, because of the nature of the time records submitted by plaintiff, it is difficult to precisely segregate activities and time spent on each activity. The burden, of course, is on the moving party to supply proper documentation and to the extent that documentation is ambiguous or lacks precision, some reduction is warranted.

In light of these considerations, I conclude that although plaintiffs did prevail on their ERISA claim and should be awarded fees on that claim, the hours for which they will be compensated must be reduced. Because this case involved both multiple parties and multiple claims, and because of the often generic nature of the descriptions provided in Pottle's time records (for example, "Reading & review of Defendant's Briefs" on July 16, 1987), it would be impracticable to allocate the actual compensable hours with any accuracy. *See Chambless I*, 815 F.2d at 873 (fee applicant who is entitled only to fees for successful claim has burden of accounting for time spent

only on that claim). I will therefore reduce the 318 hours spent by Pottle on this ERISA case by 20 percent, which yields a total of 255 compensable hours.

The next question is the appropriate rate. In arriving at the lodestar rate, I have considered the testimony of Michael Harren, Esq., a Rochester attorney who testified at the hearing. Harren, who is experienced in ERISA cases, stated that from 1988 to the present, his firm charged between $140 and $160 in ERISA cases. He also stated that he was not aware of any attorney having received more than $150 per hour in the Western District of New York. I find that this testimony was more persuasive on the issue of what attorneys in this area receive for litigating ERISA cases. I accept and credit Harren's testimony and find that a rate of $150 per hour is appropriate in this case. I am also not satisfied from this record that plaintiff counsel is such an expert in ERISA cases that his fee should be higher than the $150 per hour rate.

In support of his contention that a $250 lodestar figure should be applied, plaintiff has offered evidence of rates charged by certain other attorneys and law firms. Much of this evidence, however, relates to large firms or attorneys in other geographical areas, such as New York City. Since plaintiff is essentially a sole practitioner in Buffalo, these other attorneys' rates are of marginal value in arriving at a reasonable rate in this case. *Chambless II*, 885 F.2d at 1059.

I also find, after consideration of all the circumstances surrounding this action, that no adjustment of the lodestar is appropriate. There are few factors here weighing in favor of an upward adjustment. For instance, the action did not confer a benefit on a group of pension plan participants other than plaintiffs themselves, and did not resolve any significant issues of law. *Chambless I*, 815 F.2d at 872.

In addition, some of the same factors which necessitated a reduction in the number of hours also suggest that an upward adjustment of the lodestar is not warranted. For example, the relief obtained was

not great in light of the initial benefits offered by Brass. In fact, were plaintiffs to receive the fee they request, the attorney's fee award would greatly exceed the amount of the actual increase in plaintiffs' benefits.

Plaintiffs' counsel has not demonstrated any legitimate basis for an upward adjustment from the lodestar figure. The same reasons that support a reduction in the rate and the number of hours precludes enhancement of the lodestar figure. In my view this case was not so complex that it warrants an upward adjustment. Furthermore, the benefits were not so great to plaintiffs or to a class of plaintiffs as to warrant an upward adjustment.

Based on the above, plaintiffs are entitled to recover attorneys fees for 255 hours at a rate of $150 for a total of $38,250.

### b. Attorney's Fees for the Fee Application

In addition to the fees sought for work performed prior to settlement, plaintiffs also request attorneys' fees on the fee application itself. Defendants do not appear to contest that such fees may be awarded, but they argue that an award is not appropriate here, in large part for the same reasons that they believe plaintiffs should not recover fees on the underlying action. Defendants also challenge the particular amounts sought by plaintiffs.

Although the court is not bound to award fees incurred on the fee application, as a general matter such time is compensable if reasonably spent, since "a refusal to award fees incurred in connection with the fee application would tend to dilute the fee award and thus to undermine the very purpose of awarding fees." *Chambless v. Masters, Mates & Pilots Pension Plan*, 697 F.Supp. 642, 649 (S.D.N.Y.1988), *aff'd in part and rev'd in part on other grounds*, 885 F.2d 1053 (2d Cir.1989); *see also Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir.1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).

It appears that the award may also include compensation for the services of an attorney retained in connection with the fee application. *Alberti v. Klevenhagen*, 896 F.2d 927 (5th Cir.1990). However, this too is subject to the reasonableness requirement, and the trial court has discretion to determine whether fee counsel's services were justified in a particular case. *Jonas v. Stack*, 758 F.2d 567, 569 (11th Cir.1985).

In the case at bar, plaintiffs' counsel (Pottle) seeks compensation for 50.9 hours of work he performed following settlement of the case and prior to his retention of Mitchell T. Williams, Esq., to represent him on the fee application. In addition, Pottle seeks fees for himself after he retained Williams for a total of 65 hours relating to time spent in connection with the fee application. All time charged subsequent to the settlement is based on a $200 per hour rate for total fees incurred after the settlement and in connection with the fee application of approximately $23,000.

Plaintiffs also request an award of $15,-650 for 78.25 hours of services rendered by Mitchell Williams on the fee application, and of $5,687.50 for 45.5 hours rendered by Williams' associate, Martha Williams, Esq., at rates of $200 and $125 per hour respectively. The total of these amounts for Williams' services is $21,337.

Plaintiffs further ask for $2,000 in fees for their expert witness on the fee application, Robert H. Wagner, Esq. Wagner has submitted an affidavit stating that he spent ten hours on the case, and that his rate is $200 per hour. Lastly, plaintiffs seek $757.35 in disbursements.

Having considered the exhibits and briefs submitted by the parties on this issue, I find that plaintiffs are entitled to some fees for work performed by Willard Pottle up until the time he retained Mitchell Williams. I also find, however, that the time claimed by Pottle from September 27, 1989 to November 29, 1989 is excessive. For example, Pottle claims he spent seven hours on October 19, 1989 "Sorting out exhibits for affidavit, dictating affidavit, re-doing exhibits. Call to Cordes for copies of releases." Without further explication, this seems excessive. Furthermore, Pottle's time records give a total for each day

without showing how much of that total was spent on each activity. On October 18, for instance, Pottle states he spent six and a half hours "Researching Rule 11, Section 1927 & fee matters and review of file— dragging out prior motions, brief, moving papers." It is impossible to tell from this how much time was spent on research and how much time "dragging out" papers. Consequently, it is difficult to determine the reasonableness of such figures. To this extent, I find that plaintiff has not met his burden of accounting for his time with sufficient precision. *Chambless I, supra,* 815 F.2d 869.

In addition, some of the time Pottle spent during this period relates to matters other than the successful ERISA claim or plaintiffs' fee application, and I do not believe that fees are warranted on those matters. In particular, it appears that at least fifteen hours are attributable to work done in response to Brass' motions for fees and sanctions; again, an exact accounting of this time is impossible because the entries in the time records are often lacking in detail.

After reviewing the time sheets submitted by Pottle, then, and making the appropriate deductions as indicated above, I find that plaintiffs should be awarded fees for a total of 31.6 hours spent by Pottle after settlement of the ERISA claims and prior to Mitchell Williams' entry into the case. Using the same rate of $150 per hour as already applied, plaintiffs are awarded $4,740 for this portion of the work performed on the fee application.

I further find that plaintiffs are entitled to compensation for the services performed by Mitchell Williams and Martha Williams in connection with the fee application. This part of the case was relatively complex and hard-fought on both sides, and I therefore do not consider it unreasonable for plaintiffs to have hired an attorney for the fee litigation. I have reviewed the time sheets submitted on this application, and conclude that the hours claimed are reasonable.

As to the rate of compensation, however, I find that $150 per hour is appropriate for Mitchell Williams' services, rather than the $200 hourly rate sought. Plaintiffs submitted little evidence to support the $200 figure other than the evidence already discussed in regard to the rest of the fee application. While Mitchell Williams alleges in his affidavit that Alexander Cordes, Esq., who represents ARCO, charges or has charged $210 per hour, that has not been proven and, in any event, is not determinative of the appropriate rate. *Chambless* II, 885 F.2d at 1059. As stated, I believe that the evidence submitted shows $150 per hour to be a fair rate in this case, and I accordingly award plaintiffs $11,737.50 for Mitchell Williams' services. Martha Williams' time will be compensated at the rate of $100.00, for a total of $4,550.00. Therefore, the total compensable time to the Williams' firm is $16,287.

Plaintiffs, however, will not receive an award for the time spent by Willard Pottle at or directly in connection with the hearing on attorneys' fees. At that time, Pottle was no longer acting as attorney, but as a witness. For both he and Mitchell Williams to receive fees for this time would be duplicative and, therefore, unreasonable. The fee application itself was not of such a nature that it required Williams, his associate and Pottle to effectively litigate the matter.

■ The issue concerning the $2,000.00 expert witness fee, is whether the fee is properly compensable in light of the Supreme Court's decision in *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), which held that "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920," which provide respectively that "[a] judge ... may tax as costs" certain items, including witness fees, and that a "witness shall be paid an attendance fee of $30.00 per day for each day's attendance."

There is as yet no explicit Supreme Court or Second Circuit authority on the extent to which *Crawford* applies to cases involving fee-shifting statutes, and courts in other circuits have been divided on this issue.

See, e.g., Denny v. Westfield State College, 880 F.2d 1465 (1st Cir.1989); West Va. Univ. Hosp. v. Casey, 885 F.2d 11 (3d Cir. 1989), cert. granted, —— U.S. ——, 110 S.Ct. 1294, 108 L.Ed.2d 472 (1990); Friedrich v. City of Chicago, 888 F.2d 511 (7th Cir.1989); SapaNajin v. Gunter, 857 F.2d 463 (8th Cir.1988). However, in a decision which was affirmed without opinion by the Second Circuit, the court in Hillburn v. Comm'r, Conn. Dep't of Income Maint., 683 F.Supp. 23 (D.Conn.1987), aff'd, 847 F.2d 835 (2d Cir.1988), stated that it read Crawford as applying only to awards under §§ 1821 and 1920 and Fed.R.Civ.P. 54(d). The court held that Crawford did not reach the question of awards under the 42 U.S.C. § 1988, and therefore granted an award for the fees of an expert witness used in connection with a fee application.

Similarly, the court in United States v. Yonkers Bd. of Educ., 118 F.R.D. 326 (S.D. N.Y.1987), declined to apply Crawford to an attorney's fee case decided under § 1988, stating that "[i]n light of past practice, the congressional policy of encouraging the assertion of legal rights in civil rights matters ... and the adverse impact which a $30 a day limitation on expert witness reimbursement would have on such litigation, we decline to impose such a ceiling." Id. at 330.

I find the reasoning of Hillburn and Yonkers to be persuasive. Although both cases involved the Civil Rights Act, the logic behind those decisions also applies to ERISA, which, like the Civil Rights Act, is a remedial statute, enforcement of which is encouraged by Congress. Furthermore, in light of the Court of Appeals' affirmance of Hillburn, and in the absence of any explicit authority from that court to the contrary, I conclude that plaintiffs here are not bound by the $30 per day limit applied in Crawford.

Brass argues that the expert witness fee is not compensable because plaintiffs released defendants from all liability for costs as part of the settlement. This release, however, concerned the costs of the underlying action, not the costs of the fee application. In fact, the parties expressly excepted the matter of fees from the settlement. Since the parties clearly contemplated that there would be litigation over the fee application, I find that the settlement and releases do not bar the awarding of reasonable costs directly connected with the fee application. I therefore find that the use of an expert in this case was appropriate. Furthermore, I find that the time spent by him was reasonable but, consistent with this decision, I determined that a reasonable rate for his services is $150 per hour. Plaintiffs are entitled to recover fees for the expert witness, Robert Wagner, in the amount of $1,500.

I will deny plaintiffs' request for $757.35 in disbursements, however. Plaintiffs have submitted nothing to support this claim other than a statement in Mitchell Williams' affidavit that this was the total of plaintiffs' disbursements. It is therefore impossible for the court to know whether this figure is accurate, or what it covers.

Plaintiffs are therefore hereby awarded $59,277 as reasonable attorneys fees on the ERISA claim against both defendants and an additional $1,500 as expert fees.

## 5. Allocation Between Defendants of Attorney Fee Award

 Brass argues that if fees are awarded to plaintiffs, Arco should be responsible, not Brass. ARCO, not surprisingly, suggests the opposite. The matter of allocation of fees as between the two defendants is difficult in this case because of the posture of the case. Because there has been a settlement among the parties, no explicit finding of fault as to either defendant has been made by either the court or the parties. What is known is that plaintiffs have "prevailed" and were provided benefits by ARCO according to ARCO's severance plan and Brass has reimbursed ARCO for an unknown portion of that pay out.

The relative fault of a defendant is often an important factor in allocating attorneys fees. But, in this case, for me to resolve fault issues would require a mini-trial on the merits which would frustrate one of the

goals of settlement and would transform the fee application into a "second major litigation." *Koster*, 903 F.2d at 140, *quoting, Webb v. Dyer County Bd. of Ed.*, 471 U.S. 234, 244 n. 20, 105 S.Ct. 1923, 1929 n. 20, 85 L.Ed.2d 233 (1985).

Also, allocating the award according to the proportion of time spent by plaintiffs against each defendant would not be practical. Much of the time spent was directed to both defendants because the defenses were often intertwined and in some cases uniform.

Plaintiffs' theory was that both defendants participated in the termination of the plaintiffs. According to this theory, the transfer of assets from ARCO to Brass and Brass' termination of the employees a few days later was orchestrated in advance. Under this theory, both defendants participated jointly in a scheme to deprive plaintiffs of their benefits.

Under the peculiar circumstances of this case, in my discretion I believe that it is most appropriate to saddle each defendant with joint and several liability for the attorneys fees. *See Koster*, 903 F.2d at 139–140.

### 6. *Prejudgment Interest*

■ Pursuant to the stipulation of dismissal, plaintiffs reserved their right to petition for prejudgment interest. Plaintiffs seek interest of approximately $71,000 on the amount of the settlement calculated from the date plaintiffs were terminated in December 1985. Plaintiffs request a rate of 9% which they contend was the average market rate during the time in question.

Often, the terms of a settlement would factor in both attorneys fees and interest in arriving at the settlement figure. In this case, however, the parties were unable to agree on these issues and, therefore, rather than abort the settlement, they agreed to litigate these matters.

In determining whether and to what extent prejudgment interest should be allowed, is most difficult in this context where the parties have settled their substantive dispute. Because of that settlement, the court has made no finding as to

fault as to either defendant. Such an exhaustive inquiry would be counterproductive since it would defeat the purposes of the settlement.

The question of whether there should be prejudgment interest rests in the sound discretion of the court. Because plaintiffs have been without the use of this money until the settlement in August, 1989, I believe that it is appropriate to award some prejudgment interest. First of all, a few preliminary issues must be resolved.

Brass contends that plaintiffs' demand for prejudgment interest on the amounts received pursuant to the settlement is barred by *Massachusetts Mut. Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), in which the Supreme Court held that extracontractual damages are not recoverable in a suit under § 409(a) of ERISA, 29 U.S.C. § 1109(a). Though the Court in *Russell* did not address suits under § 1132(a)(1)(B), the Sixth Circuit has adopted the reasoning of *Russell* to hold that extracontractual compensatory damages are not available in actions for breach of fiduciary duties under § 1132(a)(1)(B). *International Union UAW Local 91 v. Park–Ohio Indus., Inc.*, 876 F.2d 894 (Table) (6th Cir.1989).

Brass cites two district court cases in support of the proposition that interest is a form of extracontractual damages not available under § 1132. In *Scott v. Cent. States S.E. & S.W. Areas Pension Plan*, 727 F.Supp. 1095 (E.D.Mich.1989), the court, relying on *Russell* and *International Union*, held that a plaintiff could not maintain an action under § 1132(a)(3) to recover interest which had accrued during the twelve years between the time the plaintiff applied for pension benefits and the time his claim was approved and he received a lump sum payment. In the other case, *Brentwood Nursing and Rehab. Center v. Janes*, 1989 WL 99557, 1989 U.S. Dist. LEXIS 10161 (N.D.Ill.1989), the court dismissed a claim for punitive damages and interest under 29 U.S.C. §§ 1109(a) and 1132(g)(2) on the ground that *Russell* barred recovery of punitive damages.

Brass's argument is not well-taken, however. I do not view *Russell* as having overturned the well-established rule that district courts have discretion to award prejudgment interest in ERISA cases. *See, e.g., Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984), *cert. den. sub nom. Cody v. Donovan,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Blanton v. Anzalone,* 760 F.2d 989 (9th Cir.1985); *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n.,* 727 F.2d 566, 579 (6th Cir. 1984); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208 (8th Cir.1981), *cert. den.* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). In fact, in order to avoid unjustly enriching defendants, awards of prejudgment interest are generally the norm if the plaintiff was in fact entitled to the money recovered. *Short v. Cent. States, S.E. & S.W. Areas Pen. Fund,* 729 F.2d 567 (8th Cir.1984). *Russell* did not change this rule; the Court simply held that ERISA does not provide a vehicle for the recovery of extracontractual damages, not that interest could not be awarded on contractual damages.

The district court cases cited by Brass serve to illustrate this distinction. In *Scott,* the court held that a plaintiff cannot maintain an ERISA action *solely* to recover interest on benefits paid him prior to the institution of the suit. In *Brentwood,* the court dismissed a claim for punitive damages and interest on the ground that the punitive damages, not the interest *per se,* were extracontractual. These cases, then, stand only for the proposition that there can be no independent extracontractual damage claim in an ERISA action; neither held that prejudgment interest is unavailable on the damages that are recovered.

Brass also notes that many of the cases awarding prejudgment interest predate the *Russell* decision. Nevertheless, there are post-*Russell* cases which continue to adhere to the view that prejudgment interest is generally available in ERISA cases. *See, e.g., Blanton v. Anzalone,* 813 F.2d 1574 (9th Cir.1987); *Jansen v. Greyhound Corp.,* 692 F.Supp. 1029 (N.D.Iowa 1987). The court does not accept Brass's contention in its brief that *Blanton* is not good

authority because it does not discuss the impact of *Russell.* A likely reason for that omission is simply that the Ninth Circuit did not consider *Russell* to have had any impact on the availability of prejudgment interest.

After considering the record in this case, I have determined that plaintiffs should recover interest on the amounts received under the settlement agreement. The next question, then, is the appropriate rate of interest to be applied.

In general, district courts have discretion in deciding what interest rate is most appropriate in awarding prejudgment interest. Some courts in ERISA cases have applied the rate for post judgment interest under 28 U.S.C. § 1961, which is tied to the rate of interest on Treasury bills. *See, e.g., Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208 (8th Cir.1981), *cert. den.* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). Other courts have held that either a statutory or a market rate may be used, depending on the circumstances. *See, e.g., Foltz v. U.S. News & World Report,* 613 F.Supp. 634 (D.C.D.C.1985) (interest calculated on basis of statutory rate, or under unusual circumstances, prevailing market rate); *Blanton v. Anzalone,* 760 F.2d 989 (9th Cir.1985) (court should use formula in 28 U.S.C. § 1961(a) unless it finds on substantial evidence that different rate is appropriate); *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n.,* 727 F.2d 566, 579 (6th Cir.1984) (district courts may, but are not compelled to, apply post judgment interest rate in 28 U.S.C. § 1961(a)).

The Second Circuit has not expressly endorsed any particular prejudgment interest rate. Although the court stated in *Katsaros v. Cody,* 744 F.2d 270, 281 (1984), *cert. den. sub nom. Cody v. Donovan,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), that awarding prejudgment interest at the prime rates was "consistent with prior case law," it did not hold that no other rate of interest was permissible.

I find that the rate provided by 28 U.S.C. § 1961(a) is appropriate in this case. Therefore, the interest rate is 7.75% per

annum which was the effective rate under § 1961(a) on August 10, 1989, the date the stipulation for dismissal was entered. The court must now resolve the amount upon which the interest should be calculated, the time from which it is calculated against which of the defendants it should be charged. None of the parties have provided the court with any clear authority that supplies these answers in the context of this unusual case.

The case is complicated by the fact that initially claims were filed for pension benefits with Brass by all plaintiffs. Four of them, the Niles plaintiffs, signed releases and received monies. These plaintiffs also covenanted not to sue. No application for benefits was made to ARCO for many months after plaintiffs' termination by Brass. In fact, it does not appear that claims were made to ARCO for benefits until June 1988. Under all the circumstances, it seems to me that interest should be calculated from that date, June 1988 until August 10, 1989 when the stipulation for dismissal was entered. For the purpose of determining interest, it seems to me that August 10, 1989 is the date that the case was settled and that payments were due the plaintiffs. If in fact plaintiffs were not paid until after that date, then post-judgment interest is appropriate and the parties should calculate that and include those payments as post judgment interest. It is anticipated that no further court intervention will be necessary concerning those matters. Therefore, utilizing the interest rate of 7.75% for fourteen months (June 1988 to August 1989) on the total ARCO award of $194,337 less sums already paid to the Niles plaintiffs by Brass results in an interest award of $17,-571. This interest is charged to both defendants jointly and severally.

### 7. Brass's Claim for Damages on its Counterclaim

The final remaining claim is Brass' claim for $29,182.40 in damages on its counter-

claim against the Niles plaintiffs for breach of the covenants not to sue. About $28,000 of this amount consists of attorneys' fees paid by Brass, and the remainder represents costs for time spent on this case by Joan Murray, Brass's Personnel Director.

The agreements in question provided in essence that the Niles plaintiffs [2] released Brass from any claims which they might have against Brass as a result of their termination, and that plaintiffs covenanted not to sue to assert such claims.

In support of their argument that Brass is not entitled to attorneys' fees, plaintiffs make much of the "American Rule" that prevailing parties are not ordinarily entitled to an award of attorneys' fees. The full rule, though, is that attorneys' fees are generally not recoverable "in the absence of statute or contractual authorization." *Demsey & Associates, Inc. v. S.S. Sea Star,* 500 F.2d 409, 411 (2d Cir.1974).

■ The rule is the same under New York law. "Absent an express contractual obligation or specific statutory authority, counsel fees are not a recoverable item of damages ..." *Rosano's Farm Store, Inc. v. International Collection Service, Inc.,* 115 A.D.2d 195, 495 N.Y.S.2d 264, 265 (1985).

But this is not the typical case where the prevailing party seeks attorneys fees. In this case, the fees can be seen as a direct measure of damages for the alleged breach of contract. The key question, then, is whether the agreements in this case created a contractual obligation which anticipated that reasonable attorneys fees would be an appropriate measure of damages.

One issue in this regard that has not been addressed by the parties is whether the agreements are releases or covenants not to sue; the terms seem to have been used interchangeably in this litigation. However, the distinction in not insignificant. In *Colton v. New York Hospital,* 53 A.D.2d 588, 385 N.Y.S.2d 65 (1976), the court stated that a

**2.** For the sake of convenience, the term "plaintiffs" will be used to refer to the Niles plaintiffs

for purposes of the discussion of this claim.

covenant not to sue is not a release since it is not a present abandonment of a right or claim, but merely an agreement not to enforce an existing cause of action. Such a distinction, although technical is nevertheless clear. Thus a party possessing the right of action is not precluded thereby from thereafter bringing suit; however, *he may be compelled to respond in damages for breach of the covenant.*

*Id.* 385 N.Y.S.2d at 66 (emphasis added). Thus, the court seemed to suggest that damages are more normally awarded in cases involving breaches of covenants not to sue than in cases involving releases.

What, then, is the difference between the two types of agreements? In *Dale Hilton, Inc. v. Triangle Publications,* 198 F.Supp. 638 (S.D.N.Y.1961), the court stated that the fact that a document is a covenant not to sue is indicated by: its being couched in terms of covenanting not to sue rather than releasing from liability (somewhat obvious, but also not too useful, since many such documents use both types of language, as well as every other conceivable synonym for them); by an express reservation of rights against others; and by the document being given in consideration of an amount less than what the plaintiff originally sought. *Id.* at 639–40. The court added that if a court can reasonably interpret a document as a covenant not to sue rather than as a release, it will do so. *Id.* at 639.

Somewhat more helpful is *Colton v. New York Hospital,* 98 Misc.2d 957, 414 N.Y. S.2d 866 (Sup.Ct.1979), which extensively reviews the question. The *Colton* court stated that a

release is retrospective; a covenant not to sue, like any other covenant, is prospective.

. . . . .

The most obvious example [of a release] is that of the release given in exchange for the compromised settlement of an action or preexisting claim, which completely discharges the cause of action. . . . Viewed a bit differently, a release is an executed agreement. No further per-

formance is necessary. . . . A covenant not to sue, however, is executory. The performance it demands . . . is the obligor's future forbearance in asserting a claim which exists or may accrue against the obligee."

*Id.* 414 N.Y.S.2d at 873.

I believe that the agreements here were covenants not to sue. They did not discharge existing claims, but were agreements not to assert claims in the future based on the employees' termination.

That does not end the matter, however. It must still be determined whether the parties, in executing the covenants, contemplated that a breach would give rise to liability for attorneys' fees. In *Artvale, Inc. v. Rugby Fabrics Corp.,* 363 F.2d 1002 (2d Cir.1966), the court stated that

the question whether a party who has breached a covenant not to sue is liable for litigation expenses inflicted on his adversary . . . appears to hinge on what the parties intended by their contract . . . The question, in other words, is to be solved not by invoking an abstract rule of law but by seeking to determine what the parties fairly contemplated, or would have had they addressed their minds to the problem.

The court added that a covenant not to sue could certainly be drawn "in such terms as to make clear that any breach will entail liability for . . . defendant's litigation expense." However, the court further held that "[i]n the absence of contrary evidence, sufficient effect is given the usual covenant not to sue if, in addition to its service as a defense, it is read as imposing liability only for suits brought in obvious breach or otherwise in bad faith . . ." *Id.* at 1008.

 In my view, the documents here did not expressly provide for liability for attorneys' fees, and whether fees should be awarded therefore depends on whether the suit was brought "in obvious breach or otherwise in bad faith." I also believe, though, that is the case. The suit against Brass by the Niles plaintiffs clearly fell within the terms of the covenant; it was not simply "a good faith test of [the covenant's] scope" for which the parties did not

**1028**

intend plaintiffs to be subject to damages. *Id.* The suit was based on allegations of discrimination arising out of plaintiff's termination by Brass, and was thus in obvious breach of the covenant. To give the covenant effect, therefore, Brass should be awarded reasonable fees as damages.

Plaintiffs' other arguments against an award on the counterclaim lack merit. Plaintiffs rely in part on this court's order entered September 22, 1989, denying Brass's earlier motion for summary judgment as to the amount of damages occasioned by the breach of the covenants not to sue. As stated in that decision, however, the motion was denied not on the ground that damages were not recoverable, but because factual issues existed as to the proper amount of the fees.

Nor does the court accept plaintiffs' contentions that Brass is precluded from being awarded fees on the counterclaim because of the settlement of the case or because Brass failed to renew its motion after its prior summary judgment motion was denied. The stipulation expressly provided that the court would retain jurisdiction over Brass's counterclaim against the Niles plaintiffs. Brass was previously awarded summary judgment on the issue of liability regarding this claim, and is not barred from now seeking damages in the form of attorneys' fees.

After reviewing the documentation submitted in support of Brass's motion and listening to the relevant testimony at the hearing on the motion, I conclude that Brass should be awarded $10,000 in damages on its counterclaim. That amount is what I determine to be the reasonable cost incurred in defending the action.

### SUMMARY AND CONCLUSION

Plaintiffs' motion for attorneys fees pursuant to 29 U.S.C. § 1132(g) against both defendant Brass and defendant ARCO is granted. Attorneys fees are awarded against defendants, jointly and severally in the sum of $59,277.

Plaintiffs' application for costs for the expert witness, Robert Wagner, Esq., is granted in the sum of $1,500.

Brass' motion for attorneys fees against all defendants pursuant to 28 U.S.C. § 1927 and Rule 11 is denied.

Brass' motion for attorneys fees against the Niles plaintiffs pursuant to 29 U.S.C. § 1132(g), 28 U.S.C. § 1927 and Rule 11 is denied.

Plaintiffs' motion for sanctions against Brass is denied.

Plaintiffs' motion for prejudgment interest is granted. Plaintiffs are entitled to share prejudgment interest from June 1988 to August 10, 1989 on the sum of $194,337 at 7.75% for a total interest award of $17,571.

Defendant Brass shall be awarded $10,000 on its counterclaim for damage against the Niles plaintiffs (Niles, Paa, Schabio, and Siarkowski).

IT IS SO ORDERED.