Peter G. APPLE, Plaintiff,

v.

Steven L. APPLE, Mary L. Apple, Apple Rubber Products, Inc., Apple Rubber Products, Inc., Profit Sharing Plan, Defendants.

No. 97–CV–0594C(Sc).

United States District Court,
W.D. New York.

Aug. 25, 1999.

Damon & Morey LLP (Diane C. Zarlock, of counsel), Buffalo, NY, for Plaintiff.

Gresens & Gillen LLP (James W. Gresens, and Patricia Gillen, of counsel), Buffalo, NY, for defendants Steven L. Apple, Apple Rubber Products, Inc., and Apple Rubber Products, Inc., Profit Sharing Plan.

Duke, Holzman, Yaeger & Photiadis LLP (Gregory P. Photiadis, of counsel), Buffalo, NY, for defendant Mary L. Apple.

## DECISION and ORDER

CURTIN, District Judge.

On January 14, 1998, an order was entered confirming the stipulation of settlement and dismissal of this action, but leaving the question of attorney's fees and costs to be determined. Items 26 and 28. The application for attorney's fees and costs arose out of a lawsuit which began on July 23, 1997, by plaintiff Peter G. Apple. Mr. Apple brought suit against his son, Steven L. Apple; his former wife, Mary L. Apple; Apple Rubber Products, Inc.; and Apple Rubber Products, Inc., Profit Sharing Plan ("the Plan"). In the action, Peter Apple sought relief from the defendants' refusal to grant his application for the distribution of his pension benefits from Principal Financial Group ("Principal"), the administrator of the Plan. On January 14, 1998, after six months of litigation, defendants agreed to permit Principal to turn over to Peter his pension benefits.

In order to understand how this lawsuit developed without detailing the complete litigation history, a brief note should be made of the relationships between the parties. Peter and Mary were the founders of Apple Rubber Products and were quite successful. They divorced in 1994 after almost 47 years of marriage. In the late 1980s and early 1990s, disputes arose about the management of the company among Peter, Steven, and Mary Apple. Litigation followed over Peter's removal as director and employee of the corporation and the transfer of Peter's shares to his son Steven. Peter filed lawsuits seeking to rescind the parties' former share-purchase agreement. Eventually, the parties agreed to settle. Peter is no longer a director, officer, or employee of the company, and control remains with Steven and Mary. However, Peter retains an interest in the pension plan administered by Principal, which became the subject of this action. Peter filed a suit for divorce, which was eventually settled by the filing of a decree for divorce and a matrimonial settlement agreement.[1]

Article X of the separation agreement provides:

As and for consideration of the Wife waiving her right to an equal division of the parties' profit sharing plans . . ., the Husband does agree to specifically name the Wife as a death beneficiary in connection with his profit sharing plan in the amount of two hundred fifty thousand dollars ($250,000) and/or name the Wife beneficiary in his Last Will and Testament in the sum of two hundred fifty thousand dollars ($250,000). **Should the husband not make provisions as provided above for the benefit of the Wife in the amount of $250,-000.00, then the Wife shall have a claim against the Husband's estate for the difference between the sum stated above and the actual amount provided by the Husband at the time of his death.**

Item 28, Exh. I, p. 48 (emphasis added).

## BACKGROUND

The basis for this lawsuit was the denial of Peter's application by Steven, the trustee of the plan, for approval of a cash distribution/rollover of the approximately $1,375,000.00 in his 401K Plan administered by Principal. Confusion arose as to whether he was seeking a rollover or a complete cash distribution of the fund. He made the claim on or about April 22, 1997, by sending an election form to Principal seeking a "Cash Distribution–Direct Rollover." Item 41, Exh. B. A copy of the form was not sent to Steven, and there is a dispute as to whether Apple Rubber re-

---

1. *See* Item 32, in which James Gresens, Esq., sets forth his version of the litigation between the parties. He states that it is important to consider this because it provides a backdrop for measuring the reasonableness of the actions of Steven and Mary.

ceived a copy. *See* Items 41 and 43. His claim was denied by a letter from Principal dated May 2, 1997. Principal advised Nelson Zakia, Esq., who was Peter's matrimonial attorney, that either Steven or Mary, trustees of the Plan, must sign off on the release of funds before there could be a transfer of funds to Peter's account. Item 28, Exh. B, and Item 41. On May 5, 1997, Mr. Zakia sent a copy of this letter to Peter Fiorella, Esq., Steven's matrimonial attorney. The letter indicated that Peter was seeking a rollover of his 401K plan. Item 41.

On May 15, 1997, Principal wrote to Apple Rubber, with a copy to Steven and Peter, stating that Peter Apple "wishes to receive a cash distribution of the funds allocated in his name. . . ." Item 32, Exh. C. Steven claims that he understood that this language meant that Peter was seeking a cash withdrawal of the fund. Principal said that it was its understanding that Apple Rubber was "unwilling to sign the PBC form authorizing the distribution to [Peter] Apple." *Id.* Principal also advised Apple Rubber and Steven that although it could not provide legal advice, it wanted to make Apple Rubber aware of E.R.I.S.A. and the Department of Labor Regulations, which address claim procedures which the trustee must follow when an application for withdrawal is made. Principal stated that the trustee must set forth specific reasons for denial with reference to plan provisions supporting the decision to deny. Item 28, Exh. C.

On June 9, 1997, Peter's counsel, Arthur A. Marrapese, Esq., of Damon & Morey, LLP, wrote to James Gresens, Esq., the attorney for Steven Apple, about Peter's application for a distribution of his 401K Plan. In this letter, he advised that "unless we hear from you or the Plan Administrator within 10 days of your receipt of this letter, we intend to file a lawsuit . . . for benefits due under the Plan." Item 28, Exh. D.

On June 23, 1997, Steven responded with a letter to Principal and a copy to Peter. At that time, Peter's matrimonial attorney, Mr. Fiorella, had been advised by Mr. Zakia's letter of May 5 that Peter was seeking a "rollover" of his account. Steven stated in his letter that as Trustee of the Plan, he "must deny Peter's request for a cash distribution," giving as a reason that his "[primary] . . . concern lies in the record of Peter Apple's own claims of mental impairment." Item 28, Exh. E. He stated that he was aware that Peter had suffered from a "diminished mental capacity" and "mental illness," and that he was "personally aware that Peter has made bizarre investment decisions in the past which have resulted in substantial loses [sic]." *Id.* Later, in making submissions in this case, he stated that in prior litigation, "he and his current attorneys aggressively and persistently alleged that Peter was mentally incompetent. . . ." Item 32, ¶ 12. He argued that he was afraid that a cash distribution would have serious tax ramifications for Peter.

In his letter in support of his reason for denial of Peter's application, Steven cited a portion of a letter written by one of Peter's doctors, David A. Gross, M.D., who diagnosed Peter as suffering from "bipolar mood disorder." Steven wrote:

I am also on notice that one of Peter Apple's doctors, David A. Gross, M.D., has diagnosed Peter Apple as suffering from a "bipolar mood disorder." Dr. Gross has written the following concerning his patient, Peter Apple:

Bipolar disorder (also know as manic-depressive illness) is characterized by severe changes in mood. These changes can lead to marked impairment of cognition, behavior and judgement. A person in a manic state can make very bad business decisions, lose control of behavior and at times become violent and irrational. Depressive episodes can be very severe, leading to total incapacitation, inability to function independently, and severely impair judgement as well. Both poles

of the bipolar disorder evidence psychosis.

Item 28, Ex. E. He asserted that although Peter and his attorneys have been made aware of his concern for the long-term security of these funds, neither had addressed this problem. Further, they had not addressed Mary's claim for $250,000.00 under her settlement agreement with Peter. *Id.*

After Principal received Steven's letter, it wrote to Steven and the attorneys on July 14, 1997, making them aware that the Department of Labor Regulations required that "when submitting an application for denying funds, the plan administrator must explain how the claimant can get his money or to provide alternatives." Item 28, Ex. G.

On July 23, 1997, Peter filed his complaint in this action and alleged eight causes of action. The first cause of action is against the Plan and alleges that he is entitled to benefits due and owing to him under the Plan under E.R.I.S.A. § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and that defendants have not complied with the law by arbitrarily and capriciously denying his application for benefits. Item 1, ¶¶ 28–38. The second cause is for breach of fiduciary duty and statutory violations of E.R.I.S.A., 29 U.S.C. § 1104, against Steven, Mary, and Apple Rubber. Item 1, ¶¶ 39–48. Plaintiff's third cause is against defendants Steven, Mary, and Apple Rubber and alleges that defendants breached their fiduciary duties under 29 U.S.C. § 1105. The fourth cause is against Steven, as administrator of the Plan, for failure to disclose information pursuant to 29 U.S.C. § 1021. Item 1, ¶¶ 57–66. The remaining four causes deal with state claims for defamation, libel, and slander, for defamatory statements, for interference with contract, and for tortuous interference with prospective economic benefit.

After filing this lawsuit, plaintiff made a motion for an expedited hearing for summary judgment on September 15, 1997. Item 6. However, on November 13, 1997, the court postponed argument because on October 31, 1997, Mary filed a motion in State court seeking to amend the separation agreement between her and Peter. In this motion, Mary asked for an order from State Supreme Court Justice David Mahoney directing that Peter designate Mary as the death beneficiary in his Plan in the amount of $250,000.00, or that the order rescind Mary's waiver of right to equitable distribution in the Plan and order the transfer of $250,000.00 to her. In her application, Mary alleged that Peter had failed to name her as a death beneficiary in connection with the profit-sharing plan and had taken steps to withdraw the entire amount in his account in a lump sum. Item 28, Exh. M. In July 1997, Peter had signed a will making Mary his beneficiary in the amount of $250,000.00, but did not disclose that fact until a few days before argument was heard. Justice Mahoney denied Mary's motion orally, from he bench, on November 26, 1997.

After this decision but before hearing argument on the motion for summary judgment, the parties informed the court that they had settled the lawsuit. With the settlement, Steven authorized the Plan to transfer the account to Peter under a rollover. The parties agreed to dismiss the second, third, and fourth causes of action with prejudice and the last four without prejudice. They agreed that the Stipulation resolved the first cause of action, with the exception of plaintiff's right to attorney's fees.

On February 17, 1999, Peter filed the motion for attorney's fees. Item 28. Mary is not part of this motion, because all of the claims against her were dismissed by the January 6, 1998, Stipulation approved by this court.[2]

---

**2.** Mary ceased to be a director of Apple Rubber Products, Inc., in March 1995 and also

ceased to be a Trustee of the Profit Sharing Plan at that time. Thus, she had no fiduciary,

Steven, Apple Rubber, and the Plan argue that Peter's claim was denied for the reasons stated in Steven's June 23, 1997, letter to Principal. Item 28, Exh. E. After the suit was filed, Steven's attorney argued that before Peter made his claim for a cash benefit, he never sought payment of monthly benefits for which he was entitled. He also argued that Steven, as trustee, had a duty to Peter not only to authorize the transfer of benefits to Peter but also to protect the funds for use Peter's retirement. Item 12, p. 6. Further, Steven says that he had a duty to protect Mary's claim to a portion of the funds. If Peter made imprudent investments, he was fearful that at the time of his death there may not be any money left to fund Mary's claim. Item 12.

Peter says that Steven did not have a valid reason for denying his benefits. As to Steven's refusal to approve the transfer of funds because of a reputed mental incapacity, Peter argues that this is a specious and unsupported reason for denial. In his letter to Principal, Steven quoted briefly from Dr. Gross's letter of September 28, 1994, but omitted the remainder, which made clear that as of the date of the letter, the doctor was confident that Peter was competent to handle his affairs.

The entire letter reads as follows:

I am writing this letter concerning my patient, Mr. Peter G. Apple. I am an Adult Psychiatrist, Board Certified by the American Board of Psychiatry & Neurology, and a fellow of the American Psychiatric Association.

I first met Mr. Apple on 6/24/93 for purposes of psychiatric evaluation. Mr. Apple presented with complaints of depression. After extensive evaluation, including review of additional information provided from previous psychiatric treatment at the University of Buffalo Department of Psychiatry by Dr. Mouchley Small, it was my clinical opinion that Mr. Apple suffered from a bipolar mood disorder. He is currently in the depressed phase. It was also my impression that Mr. Apple has suffered with this disorder for many years and probably can trace back bipolar mood swings to his teens. I began Mr. Apple on a course of lithium carbonate therapy, the standard accepted treatment for bipolar disorder. After titration of dosage to 900 mg a day, Mr. Apple responded very, very favorably, with improvement in mood. I can state without any clinical hesitation that Mr. Apple's emotional state has responded very nicely to this treatment and that his mood swing disorder has been quite stable since. Mr. Apple is currently on 900 mg of lithium carbonate daily.

Bipolar disorder (also know as manic-depressive illness) is characterized by severe changes in mood. These changes can lead to marked impairment of cognition, behavior and judgement. A person in a manic state can make very bad business decisions, lose control of behavior and at times become violent and irrational. Depressive episodes can be very severe, leading to total incapacitation, inability to function independently, and severely impair judgement as well. Both poles of the bipolar disorder evidence psychosis.

I am pleased to state that Mr. Apple has had no difficulty with psychosis or severe mood swings since he was stabilized on lithium carbonate. I can also state that at no time have I raised concerns about Mr. Apple's competence regarding his own affairs and dealing with the world around him since my June 1993 initial contact. Therefore, it is my clinical opinion, based upon best medical psychiatric certainty, that Mr. Apple's mood disorder is stable and that he has the capacity to execute contracts, initiate and/or participate in legal proceedings.

I do hope that this information is of help in Mr. Apple's concerns. Please do

statutory, or legal obligation to Peter. Item 33, ¶ 9; Item 32, ¶ 26.

not hesitate to contact me for any further information.

Item 28 Ex. H.

When a comparison is made of the portion contained in Steven's letter with the entire letter of Dr. Gross, it is clear that the presentation made to Principal was misleading and provides no basis for refusal to approve benefits. The doctor's impression was that Peter had suffered with this condition for many years but had responded very favorably to treatment, with the result that his mood disorder has been quite stable since he began treatment. In his opinion, Peter "has the capacity to execute contracts, initiate and/or participate in legal proceedings." *Id.* In his affidavit of August 19, 1997, Dr. Gross stated that he continued to see Peter at three-month intervals. He stated that "continuing today, it is my professional clinical opinion that Mr. Apple is fully component to handle his affairs." Item 28, Exh. O, ¶ 3.

In response, Peter contends that the doctor did not state what would happen if Peter failed to take his medication or what effect aging would have on his condition. Item 3, p. 6. Even if there is merit to the position that the failure of Dr. Gross to address this problem was not addressed in Steven's letter, Steven continued to resist approval of withdrawal for about six months after the suit was filed. Assuming that Steven was led to believe by the letter he received from Principal that Peter was seeking a cash distribution, his attorney knew in May, shortly after the suit was filed, that the application was for a rollover of the account.

Defendants denied Peter's claim for benefits on the ground that Mary was entitled to $250,000.00 of Peter's pension benefits. However, in the separation agreement, Mary unequivocally waived any right to a portion of Peter's benefits. She "affirmatively waive[d] any right, title or claim to [Peter's] profit sharing plan." Item 34, p.

7.[3] From the agreement, it is clear that Peter had several alternatives to provide for Mary. He could have named her as the death beneficiary in the Plan or provided for her in his will. If he did neither, Mary would have a claim against his estate. A few days before argument with Justice Mahoney, Peter furnished a will complying with the agreement.

Clearly, Justice Mahoney's decision was correct, and it should have been anticipated before the motion was made. The reading of the agreement shows that she would have no right to the $250,000.00 at this time; and if she had to wait until after Peter's death, she would have been provided for. This reason given by Steven for denial of benefits to Peter is without merit. As for the excuse that Peter was mentally incapacitated, Steven's use of the settlement agreement was also unfounded and misleading.

The other reasons proffered by Steven as excuses for denying benefits are without merit.

29 U.S.C. § 1132(g)(1) governs an application for attorney's fees in an action brought under E.R.I.S.A., 29 U.S.C. § 1001 *et seq.* "In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).

In *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990), the Second Circuit stated:

Ordinarily, the decision is based on five factors: (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of

---

**3.** ERISA prohibits the assignment of benefits to a spouse.

the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

■ It is well established that a plaintiff need not satisfy all five factors in order to receive attorney's fees. *Mendez v. Teachers Ins. and Annuity Ass'n,* 982 F.2d 783, 789 (2d Cir.1992). In addition, attorney's fees are proper even when an action is settled by the parties. *See Hewitt v. Helms,* 482 U.S. 755, 761, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987) (A "plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor" when a monetary settlement or a change in conduct that redresses the plaintiff's grievances occurs); *see also Cefali v. Buffalo Brass Co., Inc.,* 748 F.Supp. 1011, 1018 (W.D.N.Y.1990) (holding that plaintiffs who settled their E.R.I.S.A. claims were a "prevailing party" under E.R.I.S.A. and entitled to a reasonable fee).

■ While Steven, Apple Rubber, and the Plan argue that Steven proceeded as a prudent trustee, *see* Item 40 at 2, they have not cited any case law which allows an E.R.I.S.A. fiduciary to withhold funds based on mental incapacity or stated why a cash distribution is not allowed as opposed to a rollover. Principal warned the defendants prior to the filing of this lawsuit that they must comply with E.R.I.S.A. and Department of Labor Regulations. *See* Item 28, Exhs. D and H. There is no evidence that an attempt was made to even consider or comply with the regulations. Further, as I have already found, the reasons given by Steven to deny approval were specious, misleading, and unfounded, whether the application was for a cash distribution or rollover. There is no doubt that the parties had difficulty in communicating directly, and there may have been confusion about what Peter sought. A more forthright and candid approach to the common problem would have avoided the continuance of the litigation.

Defendants do not dispute that they have the financial ability to satisfy a fee award, and I find that an award of attorney's fees may deter others from acting

similarly in like circumstances. The merits of the parties' respective positions strongly support Peter's motion for attorney's fees. Here, defendants did not have a valid reason for withholding approval of the transfer of plaintiff's pension. The case law does not support defendants' argument for withholding funds based on the reasons given.

Having reviewed the record, I find that Peter's filing this lawsuit was a substantial factor in his recovery. *See Cefali,* 748 F.Supp. at 1018. Accordingly, I find that attorney's fees should be awarded to counsel for Peter.

While defendants argue that an award of attorney's fees to Peter is not warranted, they argue in the alternative that the $33,419.00 sought in attorney's fees is excessive. Item 31, Item 32. They contend that Peter's attorneys should be limited to an award of $15,353.97. Defendants contend that there are claims for administrative/ministerial tasks and for unrelated, excessive, and duplicative time which should not be billed for. Item 31, ¶ 7. They contend that "leaving messages/ attempted calls/ traveling to Supreme Court library," are administrative or secretarial tasks and should not be allowed. Item 31, ¶ 8. They also argue that recovery for time billed before the lawsuit was filed should not be allowed. Item 31, ¶ 9. I find that these charges were proper.

The defendants also dispute the charges of attorney Christopher Greene in November 1997 and December 1997 for "settlement." They claim that these charges did not relate to this suit but rather concerned the disposition of real property owned by Mary and jointly by Peter, Mary, and Steven. I find that these negotiations were conducted in an attempt to "globally" settle both Peter's pension claims and the disposition of the parties' properties. Given the amount of money at stake and the complexity of the case, it is reasonable to understand why the property would be part of the negotiations. It would be impossible to separate one from the other. This charge is allowed.

However, I agree that both Greene and Piotrowski should not be allowed to bill for time attending the argument in State Court in November 1997 when Peter was represented by his matrimonial counsel, David Stiller. Item 31, ¶ 13. I will disallow the time claimed by Mr. Greene, in the amount of $363.00. I also find that there should be a discount for time spent framing the state court actions. The total time claimed for preparing the complaint was $9,632.50. The four state claims were unrelated to the ERISA action, and I find that there should be approximately a one-quarter reduction for this work, amounting to $2,400.00.

Also, I find that there is some merit to the claim that the overall claim is slightly excessive. To compensate for this, there should be a further reduction in the amount of $5,000.00. This makes for a total reduction in the amount $7,763.00, leaving an award of $25,656.00 for attorney's fees. Costs and disbursements are allowed, in the amount of $1,081.72.

So ordered.